## GENERAL FOODS CORPORATION v. BRANNAN, Secretary of Agriculture, and three other cases.

### Nos. 9367, 9368, 9428, 9441.

United States Court of Appeals
Seventh Circuit.

Oct. 19, 1948.

Edward R. Adams, Sidney S. Gorham, Jr., William Simon and Robert W. Wales, all of Chicago, Ill., for General Foods Corporation.

Albert E. Jenner, Jr., and Edward H. Hatton, both of Chicago, Ill., for Charles W. Metcalf.

Edwin L. Weisl, of New York City, Irvin Rooks, Lee A. Freeman and J. Gordon Henry, all of Chicago, Ill. (Rooks and Freeman, of Chicago, Ill., and Simpson, Thacher & Bartlett, of New York City, of counsel), for Daniel F. Rice & Co., a partnership and Daniel F. Rice, individually, joint and several petitioners.

Howard W. Vesey, Wm. A. Clineburg and Vesey, Prince & Clineburg, all of Washington, D. C., for petitioner, Philip R. O'Brien.

James A. Doyle, Associate Sol., U. S. Dept. of Agriculture, Office of the Sol., of Washington, D. C., J. Stephen Doyle, Jr., Sp. Asst. to the Atty. Gen., U. S. Dept. of Justice, Lewis A. Sigler, of Office of the Sol., U. S. Dept. of Agriculture, of Washington, D. C., and Otto Kerner, Jr., U. S. Atty., of Chicago, Ill., for respondents.

Before MAJOR and MINTON, Circuit. Judges, and BRIGGLE, District Judge.

MAJOR, Circuit Judge.

These petitions are to review a final order, findings of fact and conclusions entered by Thomas J. Flavin, Judicial Officer, for and on behalf of the Secretary of Agriculture, dated April 28, 1947,[1] under Sec. 6b, of the Commodity Exchange Act, 7 U.S. C.A. § 9. The order imposes certain sanctions as authorized by this section, which we think need not be described for the reason that the nature of the sanctions is not involved. The issues raised here are predicated upon the contention that the activities and conduct of the petitioners were not proscribed by the Act—in other words, that the decision and order of the Judicial Officer was not authorized by the facts and law of the case.

General Foods in No. 9367 and Metcalf in No. 9368 have filed separate petitions for review, which were consolidated for hearing here, and a single brief has been filed in their behalf. Daniel F. Rice & Company and Daniel F. Rice individually have joined in a petition for review in No. 9428 and a single brief has been filed in their behalf. Philip R. O'Brien has petitioned for review in No. 9441, and a brief has been filed on his behalf. In view of the con-

---

[1] This is the date of the order under review in the petition of General Foods Corporation in No. 9367 and of Metcalf in No. 9368. Rice, Rice & Company and O'Brien filed a petition before the Judicial Officer for reconsideration of the order entered against them April 28, 1947, and the Judicial Officer's decision on such petition was entered July 11, 1947. So as to these petitioners, it is the latter order under review. We are of the view that this situation makes no material difference in the issues raised here and need not be further noted.

clusions of the Judicial Officer, as subsequently disclosed, the petition of General Foods and Metcalf is, in fact must be, treated differently from that of the other petitioners and could well form the basis for a separate opinion. . However, all the parties before us were joined in one proceeding and the issues determined in a single hearing. Furthermore, so many of the facts and issues presented are common to all petitioners that we have concluded that all of the petitions may appropriately be disposed of in a single opinion.

The complaint, issued May 26, 1945, charged that petitioners (below designated as respondents and sometimes here referred to as such) [2] "individually and collectively with each other and others" did attempt to and did corner actual rye and rye futures in Chicago, and did attempt to and did manipulate prices of such actual rye and rye futures from December, 1942, through May, 1944. Acts and conduct of the petitioners were alleged as follows: that commencing in December, 1942, General Foods purchased Chicago rye futures and took delivery of actual rye in satisfaction of such future contracts so that by December 31, 1943, it held 7,230,000 bushels of actual rye in Chicago; that this action caused a tight situation in the Chicago rye market, with a resulting inflated and manipulated price, which in turn attracted Canadian rye to Chicago; that on November 29, 1943, the Business Conduct Committee of the Board of Trade held a meeting with Metcalf, vice-president of General Foods, and informed him that his holdings and the company's holdings might tend to create a corner and dominate rye price movements, and that the company and Metcalf were not to make further purchases of December, 1943, rye futures or actual rye without prior consultation with and the consent of the committee. The complaint alleged that following this prohibition against further purchases by General Foods, the remaining petitioners engaged in a heavy purchasing program of May futures, in order to continue the futures end of the market when General Foods could not do so itself, while in May, 1944, General Foods purchased 2,000,000 bushels of actual rye from the other petitioners to carry out its part of the plan of maintaining the actual rye part of the market.

With respect to the Rice petitioners, it was further alleged that Rice & Company was engaged to merchandise the General Foods rye holdings during the winter of 1943-1944, but sold no rye since the merchandising was conducted under an arrangement that rye offerings were to be restricted to buyers who would move the rye into consumptive channels. Rice, it was averred, definitely influenced the trading of certain customers listed in a Schedule A attached to the complaint; and during the period involved, he and the other petitioners sought to prevent the increase of deliverable rye in Chicago by purchasing Winnipeg May futures and taking delivery of approximately 2,000,000 bushels of Winnipeg rye in May. The complaint alleged in much detail the holdings of the respective parties during the relevant period, both in actual rye and in May, 1944, futures, evidently for the purpose of showing their commanding position in the market, particularly when contrasted with the amount of rye available for immediate delivery. It was further alleged that the petitioners by their trading in and holding of actual rye and rye futures, as set forth in the complaint, were all speculative and caused an abnormal accumulation of rye in Chicago, which congested the transportation and storage facilities at a time when such facilities were needed for other grain crops for which there was an important demand.

All the petitioners filed answers denying individual or collective participation in a plan to corner or manipulate, and denying that any such corner or manipulation occurred.

Hearings were conducted before a Referee appointed by the Secretary. The record consists almost entirely of exhibits in-

---

[2] Lawrence J. Ryan, a registered futures commission merchant on the Chicago Board of Trade, was a respondent below and is included in the order under review. A stipulation was entered between him and the government, making the validity of the order as to him depend upon the outcome of the petition for review by the respondent Rice. Consequently, Ryan is not a party here.

troduced by the government, the bulk of which are in the form of statistical tabulations. Other than witnesses who identified such exhibits, the government relied upon the following witnesses, namely, William Buster, chief investigator for the Compliance and Investigation Branch of the Commodity Exchange Authority, Fred Clutton, Secretary of the Chicago Board of Trade, Roland McHenry, chairman of the Business Conduct Committee of the Chicago Board of Trade, and Clarence Francis, chairman of the Board of General Foods Corporation. In its case the government offered no expert testimony evaluating the data which had been presented, and consequently there is no expert testimony respecting the normalcy or abnormalcy of rye prices and of market activities. Neither was any testimony offered in proof of, and it is not contended that any short in the Chicago rye market during the relevant period was in need of actual rye for delivery or other purposes or was pressured, coerced or injured by any action taken or contemplated by any of the petitioners.

Petitioners, taking the view that the government had not proven its case, offered no testimony. The Referee's report, issued September 10, 1946, proposed findings and conclusions substantially similar to those submitted by government counsel. On petitioners' exceptions to the Referee's report, a hearing was had before the Judicial Officer who entered the order under review.

The decision and order of the Judicial Officer rejects the theory of the government as stated in the complaint in numerous important respects, including:

1. The government failed to prove that rye prices in Chicago during the period of the complaint were manipulated or artificially enhanced. This conclusion was reached notwithstanding the Judicial Officer recognized it as "perhaps the main issue in the entire proceeding."

2. No planned or collective action existed between General Foods and the other respondents during the period of the complaint preceding May, 1944.

3. The Judicial Officer was "unable to find or conclude that a corner in violation of the Act was achieved."

4. The activities of respondents during 1944 had no effect upon the prices of Chicago rye futures or actual rye. "No enhancement of the price level occurred during 1944 and we cannot find that respondents maintained a manipulated price level during 1944 up to the market decline in May."

Thus, all respondents were exonerated of cornering the price of rye at any time relevant to the instant action, and all respondents were exonerated of manipulating the price of rye prior to the time of the 2,-000,000 bushel transaction. Furthermore, General Foods and Metcalf were completely disassociated with all activities of the other respondents prior to the 2,000,000 bushel transaction. The Judicial Officer did find and conclude, however, that from some time about the beginning of 1944 and continuing into May, 1944, Daniel F. Rice, Rice & Company, O'Brien and Ryan "collaborated to manipulate the price of rye futures and actual rye * * * and to corner the rye market," and that all the respondents by reason of the 2,000,000 bushel transaction "collaborated to manipulate and did manipulate the price of rye futures and actual rye."

It is these conclusions, also designated by the Judicial Officer as findings, which are here for review. In the beginning certain observations common to all respondents may be noted. Of considerable importance is the unique statutory provision as to the formula to be employed in reviewing the instant order. The statute provides, Sec. 6b: " * * * the court shall have jurisdiction to affirm, to set aside, or modify the order of the Secretary of Agriculture, and the findings of the Secretary of Agriculture as to the facts, if supported by the weight of evidence, shall in like manner be conclusive."

Thus the standard to be employed is something other than the "substantial evidence rule" controlling in the review of other administrative orders. In Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, the only case called to our attention in which the provision has been discussed, the court indicated that a reviewing court was authorized to consider the

evidence de novo. Whatever the requirement be labeled, we think it means that petitioners are entitled to have the order vacated unless this court concludes that it is sustained by the weight of the evidence, and to us that means the preponderance or greater weight.

Another circumstance worthy of mention is the fact that the government does not charge or contend, and the Judicial Officer did not find or infer, that the respondents in any way violated express statutory or regulatory requirements or prohibitions. Furthermore, the common criteria usual in manipulation or corner cases are deceit, trickery through the spreading of false rumors, concealment of position, the violation of express anti-manipulation controls, or other forms of fraud. None of these elements are claimed or shown to exist in the instant situation.

█ It should also not be overlooked that the Chicago grain market during the period covered by the complaint was closely supervised by a Mr. Fitz, the Chicago regional supervisor, and a Mr. Mayo, an assistant market supervisor, acting on behalf of the Commodity Exchange Administration. The record discloses that these men had vast experience in connection with grain exchanges. They sat with the Business Conduct Committee of the Chicago Board of Trade almost weekly to discuss market situations. They knew of and either approved of or acquiesced in all of the transactions or circumstances referred to in the Judicial Officer's finding and decision upon which his order is predicated. Despite their intimate knowledge of every aspect of the rye market which the Judicial Officer considered pertinent, neither of these government officials detected anything irregular; in fact, they repeatedly advised the Business Conduct Committee that there was nothing to report and nothing upon which to take action. It is thus evident that they neither saw nor ascertained any reason for regulatory or preventive measures. Of course, this circumstance does not impair the right of the government to proceed as it has, but at the same time, we think it casts some reflection upon a determination made long subsequent to the happening of the events relied upon, that respondents attempted to manipulate or corner the market when no such activity was discernible by the agencies' own experienced men, who viewed and understood the situation at close range and while respondents' activities were in progress.

We think this an appropriate point to discuss another disturbing situation. It appears that this case was tried before the Referee and heard and decided by the Judicial Officer as though the respondents were charged with and found to have been engaged in a conspiracy, and this notwithstanding the government's express disclaimer that any conspiracy or agreement existed. It is not even claimed or found that the respondents acted in concert or pursued a common course of action, as is so often asserted, especially in administrative proceedings. The complaint alleged that the respondents acted "individually and collectively with each other and others." The Judicial Officer found that they collaborated with each other, and the government here characterizes their activities likewise. The decision and conclusions of the Judicial Officer make it plain that the activities, statements and declarations of individual respondents have been utilized as evidence against all respondents. The government makes no contention to the contrary but seeks to justify the procedure. The theory of the government in a nutshell, as shown by its complaint, was that the respondents during the early months of 1944 accumulated a large amount of May futures as well as actual rye available for delivery in Chicago for the purpose of embarrassing the market shorts and thereby enhancing the price. However, since the decision of the Judicial Officer which disassociated General Foods and Metcalf from the other respondents, it is claimed that the holdings of these other respondents with knowledge of the amount of cash rye held by General Foods were for the same purpose. Thus, the totality of respondents' activities is relied upon as an incriminating circumstance against each. This means, of course, that the activities of each respondent have been considered and weighed against all other respondents.

The attack which respondents make upon the procedure thus employed is, however, more pointedly illustrated by the testimony of a government investigator as to alleged conversations which took place with individual respondents. The statements thus testified to are heavily relied upon by the government, as they were by the Judicial Officer, as proof against all of the respondents. In fact, these conversations are detailed in separate findings, and concerning them the Judicial Officer in his decision states, "These conversations are of considerable significance since they throw some light on the circumstances surrounding the trading activities of respondents." The statements thus referred to were made in June, 1944, several weeks after the attempt to manipulate or corner the market, as asserted by the government, had come to an end. Even if the respondents had been acting in conspiracy or by agreement, such a statement could not be considered against any of the respondents other than the one who made it.

The government cites no authority in support of its right to use proof as to the statements and activities of one party against another in the absence of a conspiracy, agreement or a relationship kindred thereto. So far as we are aware, neither the word "collaborate" nor "collective" has any legal significance in connection with the responsibility of one person for the acts or statements of others. It is true, of course, as asserted by the government, that strict rules of procedure, including the admissibility of evidence, inherent in criminal and common law proceedings are not applicable to administrative proceedings. But no court, so far as we are aware, and we do not propose to be the first, has held in an administrative proceeding or any other kind that one person can be held responsible for the actions and statement of another in the absence of a conspiracy or agreement.

We suppose this view as to the procedure employed would ordinarily require or at least justify a vacation of the order, with directions that it be considered and decided in accordance with such view. Inasmuch, however, as we are charged with the responsibility of weighing the evidence, we shall proceed to dispose of the case on its merits.

We shall first consider the activities of the respondents Rice, Rice & Company, Schedule A customers, O'Brien and Ryan prior to the 2,000,000 bushel transaction in May, 1944. It is solely by reason of this transaction that General Foods and Metcalf have been found by the Judicial Officer, in connection with the other respondents, as having manipulated and attempted to manipulate the price. The situation which the government relies upon by reason of this transaction will be considered subsequently.

In the beginning, we shall consider the case as it pertains to the other respondents, and particularly as to Rice. We do this because Rice appears as the one against whom the government has marshalled its strongest case. Furthermore, we assume that if the government's case fails as to him it must also fail as to Rice & Company, Schedule A customers, O'Brien and Ryan.

We think the gist of the government's case is found in the decision of the Judicial Officer in which he recites certain circumstances from which he draws the inference of the violations found. The statement also highlights what we have heretofore noted, the procedure employed by which each individual respondent was charged with the acts and conduct of other respondents. The decision states: "When to the purchase and maintenance of large long lines in May futures, the taking of delivery and the holding of very large amounts are added the taking of delivery and the holding of rye in Winnipeg mentioned in Finding of Fact 28, the last-minute attempt on April 28, 1944, to make Canadian rye undeliverable unless the duty was paid, the failure of these speculators to take a profit by selling May and buying later futures, and the sale of the 2,000,000 bushels to General Foods in May 1944 by Rice, Schedule A customers, O'Brien, and Ryan, it is a reasonable inference that Rice personally and through Schedule A customers, O'Brien, and Ryan, were individually and together using the weight of their trading in an attempt to influence the price, in other

words, to manipulate the price. The attempts even reach the ambitious level of attempts to corner the market in May rye, a more newsworthy description of the kind of manipulation attempted."

Thus, the Judicial Officer's reasoning is predicated upon the following circumstances: (1) the alleged "purchase and maintenance of large long lines in May futures," (2) the alleged "taking of delivery" in Chicago, (3) the alleged "failure of these speculators to take a profit by selling May and buying later futures," (4) the "taking of delivery and holding of rye in Winnipeg," (5) the attempt "to make Canadian rye undeliverable unless the duty was paid," and (6) "the sale of the 2,000,-000 bushels to General Foods in May, 1944."

The main premise, as we understand, upon which the government rests its case is that the respondents during the period when the asserted attempt to corner and manipulate the market was in progress were exorbitant purchasers and holders of May, 1944, futures, with the expectation that the price of rye upon the maturity of such futures would be enhanced. Such being the case, it would seem obvious that the more futures purchased and held by the respondents, the greater would be their gain. However, the record, in our opinion, affords little if any comfort to the government's cause in this respect. For illustration, we shall refer to Rice's position as a purchaser of May futures during the time of the alleged attempt. We are unable to determine exactly when it is claimed the attempt was initiated but it is asserted to have been about the first of the year. In any event, Rice on December 21, 1943, was long 1,200,000 bushels in May futures. A chart introduced in evidence, the accuracy of which is not questioned, shows that by the middle of January he had reduced his position to 750,000 bushels. Early in February he had increased it to 1,490,000 bushels, but on the 24th of the same month he was long only 390,000 bushels. Five days later he was up to 470,000 bushels. During March his position in the main was somewhat stationary, although on March 31 he was down to 360,000 bushels long. In the early part of April his holdings were up to about 600,000 bushels long, when again he commenced to reduce his holdings, and by May 6, 1944, he was 215,000 bushels short. While these figures indicate that he was a trader of considerable magnitude, they also seem to demonstrate that he was doing a larger volume of business from the sale of May futures than in their purchase. Especially is this so from January until the 6th of May; in fact, it is so even from the first of January to the first of April. It may be a fact, as the Judicial Officer found, that he made rather heavy purchases in January and February. In fact, according to the chart, between early January and early February, he purchased 484,500 bushels more than he sold, but to argue that this indicates that he increased his holdings at this time in anticipation of an enhanced market in May is to ignore the fact that thereafter he repeatedly decreased his holdings until the latter part of March, when he owned 360,000 bushels of May futures. In other words, by the last of March his holdings in May futures were about 24% of what they were early in February.

The government attempts to explain this situation by asserting that the decline of Rice's position in the May futures on the Chicago Board of Trade was matched by a steady increase in his long position in Winnipeg, where he was long 1,010,000 bushels of May rye on April 29. This is hardly an accurate statement and is misleading. The fact appears to be that during the period he was decreasing his Chicago holdings in May futures by some 900,000 bushels, he was increasing his Winnipeg holdings in the same futures by only 135,000 bushels. We shall subsequently discuss Rice's dealings in the Winnipeg market, but for the present it is sufficient to state we think the comparison immaterial. After all, he was charged with attempting to corner the Chicago market and not the Winnipeg market. The government also attempts to explain the fact that Rice was short 215,000 bushels on the Chicago market on May 6 by asserting that the manipulative attempt was in danger of failure by May 4, which accounts for the fact that Rice altered his position from a long to a short. We gather from this that prior to May 4, according to the government's theory, the manipu-

lative attempt was in full swing and had been since the first of the year. Of course, the government combines Rice's trading position with the other respondents, but even so it furnishes little assistance to the government's theory because they, like Rice, were liquidating their positions during the months of March and April. Also, laying aside the dubious propriety of charging Rice with the activities of the other respondents, the query naturally arises as to why Rice would be attempting to manipulate the market for the benefit of the others. In our view, Rice's trading activity in May futures dispels rather than supports the theory that he was attempting to control or manipulate the market.

The alleged "taking of delivery" in Chicago has little relevancy to Rice as he received deliveries of only 70,000 bushels on May contracts. Again the government points to the deliveries that were received by certain other respondents. It is shown that O'Brien received total deliveries of 640,000 bushels and Ryan total deliveries of 560,000 bushels; however, only 380,000 bushels of such deliveries were received from Rice & Company, leaving 820,000 bushels which were received from other brokerage companies. Just what inference arises from this situation we do not know, unless it is that Rice anticipated that the price of cash rye would decrease just as he expected that the price of May futures would decrease.

The government argues that the respondents failed to take a profit by selling May and buying later futures, which it claims is a circumstance showing the attempt to manipulate and corner. It is asserted by Rice and to some extent by the other respondents that they did this very thing. In fact, Rice claims that he sold almost 1,-500,000 bushels of May futures and purchased a greater number of bushels of July futures. The government concedes that Rice had liquidated his May futures to the extent of 900,000 bushels, and it is not disputed that he purchased an equal number of bushels of deferred futures. It is true the Judicial Officer found that on April 29, May future was 2¢ per bushel more than the July and 5¾¢ more than the September future. On the face of the situation,

it appears that it would have been advantageous to have liquidated May futures and purchased the deferred futures. However, respondents point out numerous factors and contingencies upon which the validity of such an assumption must depend. We find no expert testimony that such a transfer of position would have been advantageous and we suspect it is easier to evaluate such a situation when viewed in retrospect than at the time. In our view, the unfavorable inference which the government draws from this circumstance is of little consequence.

Much is said about Rice and the other respondents concerning their relation with the Winnipeg market. Relative thereto, the Judicial Officer found: "Through the month of May, 1944, Daniel F. Rice, Schedule A customers, and Lawrence J. Ryan held 2,010,000 bushels of rye in Winnipeg. This is the rye Rice referred to when he told an investigator for the Government that he was holding 2,000,000 bushels of rye in Winnipeg to keep it from coming to Chicago."

While this finding makes no attempt to differentiate between the amount held by Rice and the other respondents, the record discloses that about one-half of this amount was held by Rice and the remainder by the other respondents. It is to be noted that O'Brien held no rye and had no dealings in the Winnipeg market. This is another illustration of employing proof as to the activities of one or some of the respondents against another who had no connection therewith. The government's witness Buster was the investigator referred to in this finding. While Buster's testimony on direct examination supports the finding, he substantially repudiated the testimony on cross examination where he stated, "He [Rice] didn't make the statement in that tone of voice, or with that meaning, at all." We do not think the weigher of the facts can attach very much importance to the testimony of a witness who testifies both ways on the same point. At any rate, this alleged statement was made in July, several weeks after the attempt to manipulate and corner had terminated, and cannot be considered against any respondent other than Rice. Furthermore, any suspicion

which may be directed at Rice because of this circumstance is largely dissipated by uncontroverted facts. Of importance is the fact that a substantial portion of the deliveries which Rice took in Winnipeg were subsequent to May 4, the date fixed by the government as the time when respondents realized their attempt had failed. We do not see any point in taking delivery in Canada for the purpose of keeping rye off of the Chicago market after that time. Moreover, it is clearly shown that there was no demand for rye in Chicago which could not be readily met from the supply there available. It is also of significance that there were more than 10,000,000 bushels of rye in commercial position in such cities as Minneapolis, Duluth, Kansas City and Milwaukee, all more accessible to Chicago than Winnipeg. And there is no proof that Rice or any of the respondents controlled or attempted to control any of the rye in these cities. Under such circumstances, we do not think the purpose can reasonably be attributed to Rice of holding Winnipeg rye in order to keep it from the Chicago market.

The attempt "to make Canadian rye undeliverable unless the duty was paid," sometimes referred to as the "foreign delivery rule," is much discussed and relied upon as demonstrating an effort by Rice and O'Brien to limit the amount of deliverable rye in Chicago and therefore as a step in their attempt to manipulate and control the market. The finding of the Judicial Officer relative thereto contains a sufficient explanation of the rule and its purpose as well as the importance which he attaches to respondents' activities in connection therewith. It is as follows: "On April 28, 1944, Daniel F. Rice initiated a proposal that the Chicago Board of Trade pass a regulation which would thereafter prevent delivery on Chicago futures contracts of grain, including rye, imported into the United States unless the import duty for grain to be used as food had been paid, there being an act of Congress then in effect exempting from the import duty grain to be used for livestock feed. Philip R. O'Brien favored the proposal. When counsel for the Board of Trade advised that adoption of the proposed regulation would not be proper, no

action was taken to adopt it. The proposal was an attempt to reduce the amount of deliverable rye in Chicago."

It is interesting to compare the last sentence of this finding with his decision wherein he states: "The record shows that most of the rye in Chicago outside of that held by General Foods and some of the respondents was rye imported from Canada by Cargill, Inc., in November and December, 1943. Yet on the morning of April 28, 1944, after the meeting in Rice's apartment on the night of April 27, and on the last day before the first notice day for delivery on May rye contracts, Mr. O'Brien took action to have a resolution prepared for the Board of Directors which would make undeliverable at least some if not a large part of the deliverable rye in Chicago. The circumstances justify an inference of less than an altruistic desire on the part of Mr. O'Brien to protect the market."

Thus, the importance which he attaches to the circumstances of this incident in his decision is that they raise an inference "of less than an altruistic desire on the part of Mr. O'Brien [and we suppose the same would apply to Rice] to protect the market." And we suspect that the opinion expressed in the decision comes nearer representing the view of the Judicial Officer than his finding, which no doubt was prepared by the government. More than that, Rice in his brief asserts without contradiction that the record does not disclose who initiated this rule and that the finding that Rice did so is an arbitrary presumption on the part of the Judicial Officer.

Irrespective, however, of who initiated the proposal, there is no doubt that it was strongly favored by Rice and O'Brien. On April 29, 1944, at a meeting of the Chicago Board of Trade of which respondent O'Brien was president, the proposal was discussed. The meeting was attended by numerous parties, including the regional supervisor of the Commodity Exchange Authority, officials of the Board of Trade other than O'Brien, and other interested parties. All were in favor of the proposal but concluded that it was a matter which should be corrected by the government rather than the Board of Trade.

Briefly, the situation at that time was that Cargill was a large speculator on the Chicago market and held a commanding position in short May futures, and held also a substantial proportion of all the actual rye available for delivery in Chicago. In November and December, Cargill and Continental, and particularly the former, imported a large amount of Canadian rye to Chicago where it remained in vessels or warehouses until May, 1944. Continental had unconditionally paid the duty amounting to 12¢ per bushel. Cargill on the other hand had only constructively paid the duty by depositing a certified check with the Customs Department for the amount of rye imported, retaining the right for one year to demonstrate that this rye or other rye in its possession was used for feed purposes, and thus permitting the recovery of the duty deposit. In other words, duty money had been provided to the Customs Office but, in the case of Cargill, with strings attached. So Cargill, no matter how long it held its rye, had the option of making delivery on future contracts or selling it for feed purposes. Thus it had an advantage over another trader who had paid the duty at the time the rye was imported but who desired to sell it for feed purposes.

That the situation was unfair we think is obvious, as was agreed to by numerous of the parties as well as by the Board of Trade and government representatives. The unfairness of the situation is not disputed by the government. In its brief it states, "We are not concerned with the merits of the proposal, and that fact has no relevance to the issue in this case." It seems to us, however, that the merits of the proposal should not be so readily brushed aside. Certainly it affords a sound basis for the argument by Rice and O'Brien that they were motivated by a legitimate rather than an ulterior purpose. Moreover, it is not plain to us how the proposed rule, if adopted, would have been an aid in the alleged attempt to manipulate or corner the market. On April 28, when the rule was proposed, the shorts still had thirty-two days in which to make deliveries and if the rule had been adopted the same number of

days in which to pay up their duty obligations since the seller is given the choice of any day during the contract month upon which to make his delivery. Moreover, assuming that the proposed rule might have decreased the amount of foreign rye delivered in Chicago, we still do not see how that would embarrass the shorts in making delivery on their contracts in view of the fact, as already noted, that there was an abundance of available rye at numerous points which could have been brought to Chicago at a less carrying charge than the so-called foreign rye.

This brings us to the 2,000,000 bushel transaction which took place May 13 or shortly thereafter, which the government asserts was the final step in the attempt of Rice, Rice & Company, Ryan and O'Brien to manipulate and corner the market. This appears somewhat inconsistent with another assertion by the government that the attempt to manipulate was known to be a failure by May 4. This is the transaction which brings General Foods and Metcalf into the picture. As already noted, the Judicial Officer exonerated them from all charges made in the complaint except as to this transaction.

The Judicial Officer found that some time before May 13, 1944, O'Brien received a call for margin in connection with his rye transactions, to which he was unable to respond. Rice was informed of the situation and requested to put the proposition up to General Foods who at that time owned over 7,000,000 bushels of cash rye. Shortly after, there was a meeting in the office of General Foods in New York, attended by certain officials of that company and by Rice and O'Brien. Concerning this matter the Judicial Officer found: "At the meeting General Foods ascertained the positions of Rice and O'Brien in the Chicago rye market and authorized the purchase of 2,000,000 bushels of 'distress rye' about to be dumped on the market, which, in the words of the Chairman of the Board of General Foods, would 'have the very definite effect of depreciating the value of our holdings * * *.' Rice recommended that General Foods acquire such rye. General Foods authorized the purchase of

the rye, and the taking of a short position of an equal quantity in the Chicago July rye future."

The Judicial Officer further found that as a result of this authorization, General Foods purchased through Rice 140,000 bushels from Schedule A customers, 355,-000 bushels from Rice, 495,000 bushels from Ryan, 344,466 bushels from the Rice and Ryan account, and 665,000 bushels from O'Brien, or a total of approximately 2,000,000 bushels.

The Judicial Officer further found that the purpose of this transaction "was to support the price of rye by preventing a drop in price that would have been caused if the rye purchased and held by General Foods had got into the open market," and further, as a result of the transaction all the respondents "collaborated to manipulate and did manipulate the price of rye futures and actual rye upon the Chicago Board of Trade."

In this connection we think it is pertinent to note the observation of the Judicial Officer in his decision that "no enhancement of the price level occurred during 1944 and we cannot find that respondents maintained a manipulated price level during 1944 up to the market decline in May. So even if it can be conceded that the respondents or some of them were attempting to run a corner on May rye, no price effects are disclosed and we are consequently unable to find or conclude that a corner in violation of the Act was achieved."

We understand this observation to mean that the price of rye in May and at the time of the 2,000,000 bushel transaction was not arbitrary but was the result of natural and legitimate forces. The Judicial Officer also points out: "We do not have the benefit of the testimony of an expert price analyst or economist as to whether the facts relied upon by the government are proof of, or evidence of, a manipulated price." Again, in referring to the decline in the price of rye subsequent to May 15, the Judicial Officer observes, "But because the price came down is not to prove that the only answer is a manipulated price in violation of the Act. There is no testimony that this is the answer." There are numerous theories advanced and discussed by the parties as to the purpose and effect of this transaction. We have no trouble in subscribing to the theory that the purpose of all the parties to this transaction was to keep the involved rye off the market at that particular time. There is no proof, however, as to the effect, if any, which keeping this rye off the market had upon the price, or what effect the 2,000,000 bushels would have had if it had been sold on the market. It seems implicit in the argument made by respondents, or at least some of them, that the purpose was to stabilize the existing price level and thus protect the interest of both the seller and buyer respondents. That they did not succeed, however, is evidenced by the fact that shortly thereafter the price declined, due so it is asserted to the large amount of rye which was delivered by Cargill.

We do not understand the government to contend that the transaction had or was purported to have any effect upon the price other than to stabilize or peg it at its existing level. The question immediately presented, and we think the most important one on this phase of the case, is whether such a purpose is an attempt to manipulate or corner and, if successful, results in a manipulation or corner of the market. The government relies strongly upon United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, in support of the argument that price stabilization is one form of manipulation. The holding of the court in that case, in our judgment, has little if any relevancy here. There, the parties were charged with a conspiracy under a statute which made it illegal per se to combine for the purpose of "raising, depressing, fixing, pegging, or stabilizing the price of a commodity." Moreover, the court was dealing with a situation where the price sought to be stabilized was an artificial one created and produced by the acts of the conspirators. In contrast, the price sought to be stabilized in the instant case was not, according to the findings and conclusions of the Judicial Officer, an arbitrary price but was one resulting from natural forces. Moreover, the statute here makes no reference to stabilized or pegged

prices but only to those which are manipulated.

We are favored with numerous definitions of the word "manipulation." Perhaps as good as any is one of the definitions which appears in the government's brief, wherein it is defined as "the creation of an artificial price by planned action, whether by one man or a group of men." It is rather obvious that this definiton does not cover the instant situation. According to the decision of the Judicial Officer, there was not any purpose to create an artificial price but to preserve an existing price resulting from natural forces, and certainly there is no proof that an artificial price was accomplished and we think no sound reason to believe that such was the purpose.

Respondents no doubt were faced with a precarious situation. It may be that they are subject to censure for acquiring such large holdings in cash rye, particularly General Foods who after the transaction under discussion held more than 9,000,000 bushels. There was nothing illegal, however, in these large holdings so far as we are aware. In fact, the Judicial Officer in effect so held as to General Foods. Moreover, Cargill held more cash rye at that time than all these respondents combined and thus was in a position to make large deliveries. In fact, the record discloses that shortly after this time it did so, with the resultant decrease in the price of rye.

■ Self-preservation has oftentimes been referred to as the first law of nature, and we suppose it applies to traders as well as others. We see no reason why the seller respondents as well as General Foods and Metcalf should not under the circumstances make an effort to protect their own interests. The facts concerning the sale were not secret; they were known at the time to the Board of Trade as well as to the officials of the Commodity Exchange Authority and nothing was detected wrong or irregular at that time. It is our view that the term "manipulate" as it is employed in the Act was not intended and that it does not cover a transaction such as here disclosed.

Numerous questions are raised and discussed which we find unnecessary to consider or decide. There is also other evidence which we have considered, a discussion of which would merely prolong this opinion for no good purpose. It is true there are only a few of the Judicial Officer's findings which are in dispute. As to those, insofar as they furnish any basis for the orders, it is our view that they are not supported by the weight of the evidence. In any event, it is our judgment that the conclusions are erroneous and that the orders on review should be set aside. It is so ordered.