**George F. FREY, Jr., Petitioner,**

v.

**COMMODITY FUTURES TRADING
COMMISSION, Respondent.**

**No. 90–1245.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1990.

Decided April 30, 1991.

As Amended May 29, 1991.

Rehearing and Rehearing En Banc Denied
June 11, 1991.

Raymond J. Mengler, Lee A. Freeman, Jr., Freeman, Freeman & Salzman, Chicago, Ill., for petitioner.

Joanne T. Medero, Gracemary Rizzo, James T. Kelly, Commodity Futures Trading Com'n, Washington, D.C., for respondent.

Before CUMMINGS, CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

George Frey and Edward Cox were subjects of an extended investigation by the Commodity Exchange Authority of the U.S. Department of Agriculture and the Commodity Futures Trading Commission (CFTC) into an alleged commodities price squeeze in 1971. An ALJ found Frey and Cox guilty of price manipulation under sections 6(b) and 6(c) of the Commodity Exchange Act (CEA), 7 U.S.C. §§ 9, 13b (1970), but the Commission reversed on Cox's and Frey's appeal.

Frey [1] then sought fees and costs under the Equal Access to Justice Act, 5 U.S.C. § 504 (1982) (EAJA) and 17 C.F.R. §§ 148.-1–148.30, which awards fees and costs to a prevailing party in an agency "adversary adjudication" unless the agency's position in initiating and pursuing the claim was "substantially justified" or unless special circumstances make an award unjust. 5 U.S.C. § 504(a)(1). In 1987, the same ALJ awarded Frey $132,226 under EAJA, but the Commission reversed in 1990 and denied Frey all fees. From this adverse determination Frey appeals.

## I.

The background of this case is lengthy and detailed, and has been thoroughly documented in the four opinions preceding this. *In re Cox*, [1982–84 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,767 (1983) (hereinafter Merits Order (ALJ)); *In re Cox*, [1986–87 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 23,786 (1987) (hereinafter Merits Order (CFTC)); *In re Cox*, [1987–90 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,947 (1987) (hereinafter Fees Order (ALJ)); *In re Frey*, [1987–90 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,578 (1990) (hereinafter Fees Order (CFTC)). We mention only those facts relevant for the EAJA issue.

At the center of this case is the market for May wheat futures contracts. Wheat futures contracts trade for five delivery months: July, September, December, March and May. The May contract is the

---

1. Cox was a defendant in the merits proceeding but is not pursuing EAJA fees.

final contract on which the previous year's wheat crop is traded; the new, imminent crop is traded on the July contract. Potential shortfalls of cash wheat to cover the outstanding long interest at the close of the contract period make the May contract highly volatile. *See* Fees Order (CFTC) at 36,501 (quoting Senate hearings discussing the May wheat market). May 19 is the last day for trading the May contract, and at the close on this day all remaining contracts are settled.

During early 1971, Cox and Frey, registered floor brokers and members of the Chicago Board of Trade, accumulated substantial long positions in May wheat. On January 25, Cox held long May contracts representing 1,995,000 bushels of wheat, one contract less than the speculative limit set by regulation. Cox maintained this position until May 7. Like many speculative traders, Cox neither intended to use the underlying wheat himself nor had agreements providing for its sale to commercial users. Speculative traders normally close out their position before being forced to take or make delivery. Cox also held an equal and opposite (*i.e.*, short) position in the July wheat futures contract. On May 7 delivery against the May long position began. Between May 7 and May 19 Cox stopped delivery notices on 555,000 bushels, putting that much cash wheat in his control. That left his long position in the May contract at 1,440,000 bushels, or thirty percent of the long open interest. Frey held long contracts for 760,000 bushels, or sixteen percent of the long open interest, but controlled no cash wheat. Cox and Frey's combined position at the start of trading on May 19 therefore totalled forty-six percent of the long open interest. The price at the close of trading on May 18 was $1.60¾ per bushel. Concerns about the prospects for a disruptive market prompted the Business Conduct Committee of the

Board of Trade to give Frey and Cox separate verbal warnings to make their positions available.

On May 19, the two met on the trading floor, and Cox gave Frey authority to sell his wheat for a price of $1.70 per bushel. The open interest declined as contract holders closed their positions, and by 11:31 a.m., the two controlled ninety-seven percent of the outstanding long interest. Frey's trading activity for the rest of May 19 is recounted in the CFTC's merits decision. Merits Order (CFTC) at 34,059–60. Frey ended up liquidating the bulk of the 2.1 million bushels he controlled during the last ten seconds of trading at $1.70 per bushel, more than nine cents above the previous day's settlement price and only slightly less than the daily "limit up" price. After the close, Cox actually ended up short 85,000 bushels and had accepted delivery of 585,000 bushels. He settled his short with his cash wheat, sold 405,000 bushels of his holdings on the cash market between June 3 and July 9 and eventually used his remaining 95,000 bushels to deliver against a short position in the July contract. Frey took delivery of 225,000 bushels of wheat on his closing long position. He sold 130,000 bushels in the cash market between May 26 and June 21 at prices substantially lower than $1.70 and eventually delivered the remaining 95,000 bushels against a short position in the July contract.

■ The Commodity Exchange Authority of the Department of Agriculture, predecessor to the Division of Enforcement of the CFTC,[2] prosecuted Frey and Cox for price manipulation. An ALJ sustained the complaint and imposed sanctions on January 10, 1983. The Commission granted Cox's and Frey's appeal on July 15, 1987,

---

**2.** The proceeding was transferred on April 21, 1975, to the CFTC pursuant to section 411 of the Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93–463, 88 Stat. 1389 (1974). For simplicity, we refer to the "Division," representing the CFTC's Division of Enforcement, as the government's enforcement arm throughout the proceedings below.

The Commission argues that it should not be held responsible for the Department of Agricul-

ture's decisions made prior to 1977, when the successor CFTC took control. However, the CFTC Act of 1974 authorizes transfer of administrative functions, which include Cox's and Frey's prosecution. CFTC Act of 1974, section 411, 88 Stat. 1389 (1974). Because the enforcement proceeding was a single action that simply spanned two successive agencies, the CFTC inherits the liabilities associated with this action as well.

and reversed the initial decision of the ALJ. The Commission found that the Division had failed to prove either that Cox and Frey had the ability to influence market prices or that artificial prices existed. The Commission also raised doubts that Frey and Cox had caused the price increase. It expressed no view on the question of intent.

Frey then sought fees and expenses under EAJA in August 1987. He was successful in the initial proceeding, where the ALJ found, after examining only the Merits Order (CFTC) and not the entire record, that "[t]he Government made a mistake by instituting this action against the Respondents and the Commission's [Merits] Opinion affords no latitude to hypothesize that there was any substantially justified grounds to conclude otherwise." Fees Order (ALJ) at 34,320. The ALJ concluded that it was impossible for Frey to have manipulated the market and rejected the argument that the Division's victory in the Merits Order (ALJ) proved that the position was substantially justified. And in response to the agency's claim that its position was reasonable because the case attempted to establish a new type of price manipulation, the ALJ responded:

> The law in existence on May of 1971 is the same law applied by the Commission in this case. The Government is charged with the knowledge of the law. Simply stated, ignorance of the law on the part of the Government is not a valid bar to a claim for an award.

Fees Order (ALJ) at 34,321. Frey's judgment was for $132,226.22.

This judgment did not survive review. More than two years later, on January 19, 1990, the CFTC reversed the ALJ's decision and denied all fees to Frey. The agency first held that the ALJ erred by confining his review to the Commission's opinion and not reviewing the record as a whole. The CFTC, pointing out that the ALJ erred in replacing the "substantial justification" standard with a "substantial evidence" standard, then held that the government's justification for initiating and pursuing the action was reasonable. Finally, the agency

determined that the facts in the record supported the Division's attempted enforcement. From this decision Frey appeals.

## II.

■ We review the Commission's decision for abuse of discretion. *Pierce v. Underwood,* 487 U.S. 552, 560, 108 S.Ct. 2541, 2547, 101 L.Ed.2d 490 (1988); *see also Phil Smidt & Son, Inc. v. N.L.R.B.,* 810 F.2d 638, 641 (7th Cir.1987) (substantial evidence standard). This standard operates somewhat peculiarly in the EAJA context, since we must review *inter alia* the agency's interpretation of the law at the time of the prosecution. In *Pierce,* Justice White's separate concurring and dissenting opinion suggests a more plenary standard of review, 487 U.S. at 583–86, 108 S.Ct. at 2559–61, but the majority opinion clearly affirms the more deferential abuse of discretion standard. 487 U.S. at 558–63 & n. 1, 108 S.Ct. at 2546–49 & n. 1.

■ We also must plumb the meaning of "substantial justification," a term far from self-defining. The Fees Order (ALJ) interprets the test as "a slightly more stringent measure than one of reasonableness." Fees Order (ALJ) at 34,320. The Commission held that this was not the correct standard and adopted the standard of simple "reasonableness." Fees Order (CFTC) at 36,500. The Supreme Court earlier endorsed the simple reasonableness formulation, *Pierce,* 487 U.S. at 563–68, 108 S.Ct. at 2549–51, and we apply it here.

We therefore must determine whether the CFTC abused its discretion in determining that the Division's enforcement proceeding had a reasonable basis in law and fact. We examine both the state of the law and the facts in the record to determine whether there was substantial justification. *Ramos v. Haig,* 716 F.2d 471, 473 (7th Cir.1983) (stating test under analogous EAJA statute for actions against government as a whole).

## III.

Before assessing the EAJA issue, we must set out the rationale of the merits and fee orders below.

### A. *Elements of a Squeeze and the CFTC's Merits Order*

■ At the heart of this case is the offense of price manipulation. Manipulation, broadly stated, is an intentional exaction of a price determined by forces other than supply and demand. Manipulation of commodities markets is punishable under the CEA through prohibition from trading, fines, imprisonment, cease-and-desist orders and other penalties. 7 U.S.C. §§ 9, 13, 13b (1988).

■ Sophisticated economic justification for the distinctions made in this area of the law may at times seem questionable. Sometimes the "know it when you see it" test may appear most useful. Nonetheless, the relevant distinctions have been authoritatively articulated, and we rely on them here but with appropriate recognition of their limitations. In this regard, a "squeeze" has been defined as a type of manipulation, generally occurring when the long holder does not have direct control over the cash crop, as in a "corner." A prototypical squeeze occurs when a trader attains a dominant long position and can force shorts facing an inadequate cash supply to cover their positions at unfair prices. The shorts are "squeezed" into settling their holdings with the dominant long at above-market prices as the delivery date approaches.

> An intentional squeeze has all of the attributes of a price manipulation, with a single exception. The scarcity of cash supplies available to shorts for delivery purposes exists through no active effort of a long in the market, but is due to other conditions such as drought, heavy exports, hoarding by commercial users, or transportation interruptions. In all other respects, however, the conduct of the long during an intentional squeeze is indistinguishable from a price manipulation. The demand (long) side of the futures contract is dominated by those with long positions and is used intentionally to create artificially high prices.

P. Johnson & T. Hazen, 3 *Commodities Regulation* § 5.05 (1989). The CFTC explained "manipulative squeezes" in an earlier adjudication:

> Squeezes in general and manipulative squeezes in particular are possible only when the delivery option disappears and its tempering effect is lost. Thus, the adequacy of "deliverable supply," as distinguished from supply generally, and the role of market participants in the supply scenarios is of great significance in any analysis....
>
> The acquisition of market dominance is the hallmark of a long manipulative squeeze. For without the ability to force shorts to deal with him either in the cash or futures market, the [long] manipulator is not able to successfully dictate prices because a short may buy grain from other sources and deliver against his commitments.

*In re Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982–84 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,796, at 27,285 (1982).

■ The elements for proving manipulation through a squeeze are not established by statute or regulation but have been outlined by federal court decisions. The elements are: (1) that the accused holds a controlling dominant long position in the market; (2) that the accused specifically intends to execute a squeeze; (3) that an artificial price exists at the time of the offense; and (4) that the accused causes the artificial price. *See G.H. Miller & Co. v. United States*, 260 F.2d 286 (7th Cir. 1958), *cert. denied*, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959).

The ALJ originally found that the government proved all the elements against Cox and Frey, but the Commission held, first, that an adequate deliverable supply of wheat meant that there was no artificial price. The agency then found that the closing price of $1.70 per bushel was not artificially high. The Commission finally questioned Frey and Cox's ability to have caused the artificial price. Commissioner West dissented, asserting that all elements had been proved.

### B. *The CFTC's Fees Order*

In its reversal of the ALJ's fees order, the Commission found that the agency's prosecution had a reasonable basis in law and fact. First, the Commission held that "clarity of the applicable law is an important factor in determining whether the government's position was substantially justified." Fees Order (CFTC) at 36,500. The uncertain status of the law surrounding price manipulation counted in the Division's favor. Moreover, a key case defining market manipulation, *Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir.1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972), had been resolved only six weeks before the complaint was issued in Frey's case.

Second, the Commission believed that the historical pattern of May wheat contract difficulties justified the decision to proceed:

> [T]he evidence known to the Department from 1971—including the concentrated nature of the long positions in the expiring wheat contract, the tight supply of cash wheat at or near delivery points, the steep futures price rise on the last trading day, and Cox's and Frey's stated price objectives—paralleled the circumstances of previous May wheat market congestions. Thus, it was reasonable to issue the complaint.

Fees Order (CFTC) at 36,501.

Third, the Commission believed that going to trial was justified on the basis of existing evidence. Factual evidence and expert opinion testimony indicated that the closing futures price for May wheat was abnormally high compared to prices in other relevant markets, that inadequate stocks of deliverable wheat existed in Chicago and that Frey and Cox intended to increase

prices by their trading strategy. Fees Order (CFTC) at 36,501.

Fourth, the Commission held that a hearing was justified to examine Frey's affirmative defense that a dominant short had been the cause of the price rise on the final day of trading. Frey claimed that Cook Grain, which controlled about forty-seven percent of the open short interest, chose to sell 1,750,000 bushels of deliverable wheat at the Gulf of Mexico for $1.79 per bushel, rather than delivering it to Chicago.

Finally, the order points to the Division's initial success before the ALJ and the split in opinion within the Commission as evidence—though not conclusive in itself—of the reasonable basis for the government's suit.

### IV.

■ Against this backdrop we assess Frey's claims that the CFTC erred in finding a substantial basis in law and fact.

### A. *Basis in Law*

The government contends that the five appellate court cases [3] as of 1972 defining the offense of price manipulation supported its decision, especially in light of the Department of Agriculture's 1971 victory in *Cargill*. Frey responds that the Division's position in this case and the ALJ's original decision conflict with one appellate case (*Volkart Bros.*) and one administrative case (*Indiana Farm Bureau*). He argues that the decision was unsupported by any other decision finding a manipulative squeeze.

We find that the legal authority supported the Division's decision to proceed. The five cases involved attempted corners or squeezes, each arising from a different factual setting. *General Foods Corp.* con-

**3.** *General Foods Corp. v. Brannan*, 170 F.2d 220 (7th Cir.1948); *Great Western Food Distributors, Inc. v. Brannan*, 201 F.2d 476 (7th Cir.), *cert. denied*, 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404 (1953); *G.H. Miller & Co. v. United States*, 260 F.2d 286 (7th Cir.1958) (en banc), *cert. denied*, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959); *Volkart Brothers, Inc. v. Freeman*, 311 F.2d 52 (5th Cir.1962); *Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir.1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972).

The CFTC, or its predecessor, the Department of Agriculture, also undertook at least two administrative enforcement proceedings under the price manipulation prohibition. *In re Hohenberg Brothers*, [1975–77 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 20,271 (1977) (attempted manipulation); *In re Indiana Farm Bureau Cooperative Ass'n, Inc.*, [1982–84 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,796 (1982) (manipulation).

cerned an alleged corner on the rye market where the court found no evidence of intentional manipulation or conspiracy. *Great Western Food* involved a corner on the egg market in December 1947 that withstood appeal. *Miller* affirmed certain penalties under the CEA for manipulation in the December 1952 egg market. *Volkart Bros.*, reversing a finding of manipulation in an alleged cotton squeeze, fleshed out the "intent" requirement. *Cargill* involved the wheat market and marked an important victory for the agency under the CEA. While the cases paint a general picture of possible practices of manipulation, they establish no key principles which the Division ignored in this case. Frey attempts to distinguish these cases by arguing that the traders in each achieved control over some cash supply. While true, this does not make the Commission's position unreasonable. The Commission's investigation of Cox and Frey proceeded on the theory that control of the cash crop was *not* essential for a squeeze, a proposition supported by some commentary. 1 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud*, § 4.6, at 82.328–330 (claim that cash control needed for corner "mathematically incorrect"; cash supply need only be small relative to number of shorts). This is a plausible proposition; to force a squeeze there is no logical necessity for the dominant long to control the cash crop, only that he put the shorts in the unsavory position of dealing with him in the face of a known shortage of cash commodities.

In addition, Cox apparently did control a sizable position of cash wheat. Frey apparently knew of Cox's cash wheat position when Frey agreed to act as Cox's broker on the last day of trading, and the Division sought to prove that the two had acted in concert. The ALJ found that "both Cox and Frey knew that Respondent Cox had been accumulating a large holding of cash wheat by stopping delivery notices." Merits Order (ALJ) at 27,104.

Frey's reliance on *Volkart*'s statement about control of the cash crop as essential to manipulate the market is simply misplaced. *Volkart* does not preclude the possibility of successful manipulation without such control. Instead, it holds that previous cases are not analogous because control of the cash crop was present:

> In most, if not all of the cases in which a trader has been adjudged guilty of manipulation, it has effectively controlled the spot commodity to the extent necessary to enable it to convert its dominant long futures position into an illegal corner or squeeze. In the present case, the petitioners did not control the available supply of "certificated cotton."

311 F.2d at 59 (citation omitted).

In short, *Volkart* did not impose on the Division the requirement of proving cash control to prove a squeeze, and even if there were such a requirement, the ALJ's holding that Cox controlled a significant cash supply supports the Division's decision to proceed.

### B. *Basis in Fact*

To escape EAJA fees, the Division must also have had a reasonable belief that it could prove the elements of price manipulation. We review each element in turn.

The first is an ability to influence prices, which requires a comparison of the wheat controlled by Frey with the appropriately defined wheat "market." Frey argues that the Division's position that the appropriate market definition was only the immediate Chicago area unreasonably excluded consideration of twenty-four million tons of deliverable wheat at Kansas City and elsewhere. The CFTC eventually rejected the Division's definition, but we cannot say that the view was unreasonable. The opinions below reflect substantial debate over the issue of market definition. Both sides presented expert witnesses. Market determination is a fact-intensive question, a task that has given a number of courts difficulty in a variety of contexts. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 360 n. 37, 83 S.Ct. 1715, 1739 n. 37, 10 L.Ed.2d 915 (1963) ("fuzziness" inherent in any attempt to delineate relevant geographical market); *Wilk v. American Medical Assn.*, 895 F.2d 352, 360 (7th Cir. 1990) (market power a "fact-bound ques-

tion"), *cert. denied*, —— U.S. ——, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990). Frey and Cox controlled a substantial position in the market during the final trading period. They held a majority of the long open interest in the May wheat contract on the last trading day. They controlled sixty-one percent with an hour and twenty minutes of trading left, and ninety-seven percent with thirty minutes left. Again, although the Division ultimately failed on the merits, we cannot say that the Division's attempt to prove that Frey had control of the market relevant for manipulation was not substantially justified.

The second element of the offense is the existence of an artificial price. Frey contends that there was no indication of an artificial price, and he cites expert testimony and the Commission's conclusion that the price on May 19 was not artificial. Once again, the Division simply re-weighed the evidence presented by the two sides and determined that the ALJ came to the incorrect conclusion. This does not imply that the government's original position—supported here by an expert witness—was so unreasonable as to lack substantial justification in fact.

The third element is causation. Frey asserts that the government did not have a basis for its claim that Frey was the cause of the price increase on the final trading day. Once more this is a factual matter that was disputable before trial—the Division had an expert willing to testify that $1.67 was an artificially high price, whereas Frey was able to convince the Commission that a price of $1.70 was not unreasonably high. In fact, the analysis in the Merits Opinion (CFTC) does not evaluate whether or not Frey's behavior was a causal factor but instead indicates in dicta that the ALJ failed to sort out the possible effect of the dominant short in determining whether Frey's behavior caused the price rise. The government may have been wrong, but we cannot say that it was so wrong as to be unreasonable.

The fourth element is intent. Frey points to the Commission's determination that he lacked the requisite intent. Such a determination required extrapolation from existing principles of case law, and, as discussed above, the fact that Frey personally did not possess cash commodities is not dispositive. The long positions accumulated by Cox and Frey, combined with the events of the final day of trading, warranted the Division's decision to test at trial the inference that the traders possessed the requisite intent.

## V.

For these reasons, we find that the CFTC's decision to deny fees to Frey is supported by substantial evidence. The petition for review is

Denied.