**G. H. MILLER & COMPANY et al., Petitioners,**

v.

**UNITED STATES of America and Ezra Taft Benson, Secretary of Agriculture of the United States, Respondents.**

**No. 11959.**

United States Court of Appeals Seventh Circuit.

Jan. 7, 1958.

On Rehearing Feb. 26, 1958.

Rehearing En Banc Granted May 16, 1958.

On Rehearing En Banc Sept. 23, 1958.

---

Lee A. Freeman, Chicago, Ill., Hobart Newton, Stuart, Iowa, Joe B. Tye, Marshalltown, Iowa, K. K. Smith, Jr., Fort Worth, Tex., for petitioners.

Neil Brooks, Asst. General Counsel, Donald A. Campbell, Benjamin M. Holstein, Attorneys, U. S. Department of Agriculture, Office of General Counsel, Washington, D. C., J. Stephen Doyle, Jr., U. S. Department of Justice, Washington, D. C., for respondent.

Before MAJOR, SCHNACKENBERG and PARKINSON, Circuit Judges.

PARKINSON, Circuit Judge.

The petitioners have filed a petition in this court to review and set aside an order of the Secretary of Agriculture entered by the Judicial Officer acting pursuant to the authority delegated thereby in a disciplinary proceeding under section 6(b) of the Commodity Exchange Act, 7 U.S.C.A. § 9, revoking the registration of the petitioner G. H. Miller and Company as a futures commission merchant and the registration of the petitioner Gilbert H. Miller as a floor broker, and denying all trading privileges of the other petitioners for periods ranging from sixty days to one year.

The cause involves egg transactions on the Chicago Mercantile Exchange during the month of December 1952. To those familiar with the operation of the Exchange eggs are referred to as *cash eggs* which are either *fresh eggs,* if they have not been in cold storage or if placed in cold storage have not been there for more than 29 days, or *refrigerators,* if they have been in cold storage for more than 29 days. A *carlot* consists of 480 cases with 30 dozen eggs in each case.

*Deliverable eggs* are cash eggs that may be delivered in satisfaction of futures contracts. *Futures contracts* or *futures* are contracts under which the seller agrees to sell and deliver cash eggs in a specified month and the buyer agrees to accept and pay for the eggs when delivered at the contract price. The buyer is a *long* and the seller is a *short* and the month designated for delivery is the *delivery month* or *contract month.*

The complaint charged in substance that the ten petitioners acted collectively and in a uniform manner pursuant to an understanding or agreement to corner and manipulate the egg market. It specifically charged purchases of December 1952 egg futures on December 17, 18 and 19; withholding such futures from sale during those three days; selling futures during December 22 and 23, the last two days of trading, at maximum prices; requiring and receiving delivery of December futures with knowledge by petitioners of an insufficient supply of deliverable eggs and the further knowledge that the major portion of such deliverable eggs were in their possession; withholding cash eggs from sale during the period of trading in December futures, and refusing to sell such eggs after the close of December futures trading except at a premium over prevailing prices for cash refrigerator eggs and thereby attempted to corner and did in fact corner and attempted to and did in fact manipulate the price of a commodity in interstate commerce and for future delivery on or subject to the rules of the Board of Trade in violation of the Commodity Exchange Act.

Hearings were held before a referee. Evidence was presented by the government but none was offered by the petitioners. The Referee issued his report which contained recommended findings and conclusions to which the petitioners filed exceptions.

Arguments were then presented to the Judicial Officer. He made findings of fact and stated conclusions of law thereon and entered the decision and order herein sought to be set aside by the petitioners.

Section 6(b) of the Commodity Exchange Act, Title 7 U.S.C.A. § 9, provides that "the findings of the Secretary of Agriculture as to the facts, if supported by the weight of evidence, shall * * * be conclusive." This court has heretofore held that to mean the preponderance or greater weight of the evidence. General Foods Corporation v. Brannan, 7 Cir., 1948, 170 F.2d 220. However, in this case the petitioners offered no evidence and if a plaintiff establishes a prima facie case and the defendant offers no evidence in defense the plaintiff has discharged the burden of proof by a preponderance or greater weight of the evidence. Lilienthal's Tobacco v. U. S., 1878, 97 U.S. 237, 267, 24 L.Ed. 901. Accordingly if the evidence in the record now before us established a prima facie case on behalf of the government the findings are supported by the weight of the evidence and are conclusive.

The petitioners concede that the "findings of actual facts consisting largely of market and trading statistics are not disputed". The evidence is that on December 16, 1952 the petitioners held 46 long December egg futures contracts, or 13.98% of the total, increasing their position to 216 long December futures on December 19, or 77.98% of the total, and at the close of trading on December 22 the petitioners held 200 long futures which was 100% of the total and on December 23 they held 66 long futures which was also 100% of the total on that date. The petitioners also owned 19.5% of the deliverable refrigerator eggs in Chicago on December 16 and their holdings were increased to 72.1% on December 23 and to 98.7% on December 31. On December 17 the holders of 19 short futures could not liquidate their contracts without resorting to the petitioners, to fresh eggs or to out-of-town storage eggs, and at the close of trading on the three days prior to the last day of trading, December 18, 19 and 22, (the 20th and 21st fell on Saturday and Sunday) the number of short futures which could not be otherwise liquidated was 98, 134 and 123, respectively. On the last day of trading, December 23, the holders of 106 short futures liquidated their positions by purchasing futures contracts from the petitioners and at the close of trading 66 December contracts were open on the Exchange and 33 thereof could not be liquidated without resorting to petitioners, to fresh eggs or to out-of-town storage eggs. An almost prohibitive time element was here involved in acquiring fresh eggs and, even if procurable, the price thereof would have been no less than a short would have to pay in resorting to petitioners; that refrigerator eggs stored in out-of-town warehouses had to be tendered prior to 7 A.M. on December 24 and even if available were so negligible that the petitioners still had control over the cash egg supply.

There was also evidence that the maximum rise in futures price permitted by the Exchange was two cents per day and on December 18, 19 and 22 the futures price rose to the maximum allowable amount each day, and as the result of the manipulation of the petitioners an artificially high price was created producing a profit to the petitioners in the sum of $162,695.15; that the petitioners cornered the December 1952 egg futures market on the Chicago Mercantile Exchange and manipulated the prices of December 1952 egg futures contracts and refrigerator eggs in Chicago.

There was also positive testimony that the shorts were "squeezed" by the petitioners and we believe the following conversation in evidence between one of the shorts and the petitioner Gilbert H. Miller is most significant:

"Q. Tell us about your negotiations with Mr. Miller, concerning that purchase on the 30th. A. Well, I called Gil, and I said, 'Gil, you know I am short two cars of eggs, and I understand you are the only one who has the eggs for delivery. I would like to purchase.' So, he says, 'Are you in this deal?' He said, 'Gee, I'm sorry you happen to be in it.' So we started to talk. I said, 'Well, you want to sell me two cars of eggs?' 'Yes, I will sell you two cars of eggs.' I said, 'What do you want for them?' He said, 'I want a cent over the closing option.'

"Q. What was that? A. 48 and a half cents.

"Q. The closing option was 47 and a half? A. Yes, I said, '48 and a half cents for storage eggs?' I said, 'That is ridiculous.' He said, 'How much do you think these eggs are worth?' I said, 'They are worth about 35, 36 cents, at the most 38 cents.' But inasmuch as I did not want to default, I bought two cars of eggs, which I feel I overpaid at least 12 cents a dozen for delivery on the Exchange."

To us this is indicative of the fact that the petitioners had a corner; that they knew it and had the shorts on their knees and at their mercy.

The Judicial Officer found that the concentrated long position of the petitioners

constituted a large, dominant and controlling interest which was the result of concerted action by the petitioners and that the petitioners manipulated prices of both December 1952 egg futures on the Chicago Mercantile Exchange and deliverable cash refrigerator eggs in Chicago and cornered the market in violation of the Commodity Exchange Act.

We believe that our decision in Great Western Food Distributors v. Brannan, 7 Cir., 1953, 201 F.2d 476 is determinative of this case. Basically the facts are quite similar, moreover, in Great Western the petitioners testified in their own defense and offered evidence to controvert that introduced by the government while here the petitioners sat silently by and offered no evidence on their behalf whatsoever.

█ The petitioners contend that they did not need to because the government failed to sustain the burden of proof by a preponderance of the evidence. However, a careful reading of this record will disclose that the findings of the Judicial Officer and his conclusions that the petitioners cornered the egg market on the Chicago Mercantile Exchange in December 1952 and manipulated the price in violation of the Commodity Exchange Act were sustained by a preponderance or the greater weight of the evidence.

We are fully cognizant of the fact that corners can unintentionally develop and that it is almost impossible to prove by direct evidence that the acts and transactions of the petitioners were undertaken pursuant to an understanding or agreement to act collectively and in a uniform manner. Proof of such concerted action and the intent to so act must generally be circumstantial unless one or more of the participants would so admit. However, the evidence in this record discloses a long chain of circumstances which definitely established prima facie that the petitioners did so act with the intent that their combined acquisitions would cause an artificial price increase and enable them by pressure to unjustly liquidate their holdings at a profit.

█ We recognize that the burden upon the government to prove its case by a preponderance of the evidence cannot be met by failure of the petitioners to testify or call witnesses in their behalf but the failure of the petitioners to testify, after the introduction of evidence establishing a prima facie case by the government, most assuredly creates a presumption that their testimony would have been unfavorable to them. Bowles v. Lentin, 7 Cir., 1945, 151 F.2d 615, 619. We are in complete accord with the thought expressed by Mr. Justice Frankfurter in his concurring opinion in the case of Adamson v. People of State of California, 1947, 332 U.S. 46, 67 S.Ct. 1672, 1680, 91 L.Ed. 1903, on page 60, when he says:

"Sensible and just-minded men, in important affairs of life, deem it significant that a man remains silent when confronted with serious and responsible evidence against himself which it is within his power to contradict."

In respect to the other questions raised and argued we are satisfied no error exists and further discussion would serve no purpose other than to unnecessarily extend this opinion.

The petition to review and set aside the order is denied.

On Petition for Rehearing

SCHNACKENBERG, Circuit Judge.

On their petition for rehearing, G. H. Miller and Company and Gilbert H. Miller, petitioners, ask us to modify the disciplinary order entered against them by the Secretary of Agriculture.

The penalties imposed by the Secretary are too harsh. I would modify said order so as to reduce the penalty imposed on Miller and Company so that its registration as a futures commission merchant would be suspended for six months rather than revoked, and the registration of Gilbert H. Miller as a floor broker would be suspended for a period of six months rather than revoked; and further that both of said petitioners be prohibited, directly or indirectly, from

trading speculatively on any contract market for a period of one year, and that during said period futures contracts may be executed providing they are clearly bona fide hedges against the cash commodity actually possessed by G. H. Miller and Company or Gilbert H. Miller, and all contract markets shall refuse to said G. H. Miller and Company and Gilbert H. Miller the right to so trade speculatively on their exchanges for a period of one year.

Our right to make such modifications has not been challenged by respondents. Counsel for respondents notified the clerk of this court that no reply would be filed to the petition for rehearing "inasmuch as" it consists "merely of a reargument of the issues which have been previously briefed and argued".

As to other points presented in the petition for rehearing, I vote to deny the same.

MAJOR, Circuit Judge.

I agree with Judge SCHNACKENBERG that the penalties imposed in this matter are too severe. I agree with his opinion on the petition for rehearing and vote to deny under the same conditions as he has.

PARKINSON, Circuit Judge.

The petition for rehearing should be denied.

This court has no power or right to reduce a penalty imposed by the respondent which is within the statute. In the case of Moog Industries v. Federal Trade Comm. (Federal Trade Commission v. C. E. Niehoff & Co.), 355 U.S. 411, 78 S.Ct. 377, 379, 2 L.Ed.2d 370, the Supreme Court reversed this court for changing a forthwith cease and desist order to take effect at a future time and held as follows:

"In view of the scope of administrative discretion that Congress has given the Federal Trade Commission, it is ordinarily not for courts to modify ancillary features of a valid Commission order. This is but recognition of the fact that in the shaping of its remedies within the framework of regulatory legislation, an agency is called upon to exercise its specialized, experienced judgment."

Accordingly we have no right to substitute our judgment for that of the respondent. The penalty affixed by the respondent was within the statutory limits. Whether we believe it to be too severe or otherwise is not within our power to determine.

To paraphrase the language of the Supreme Court in Niehoff the respondent alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress.

I would deny the petition for rehearing.

On Petition for Rehearing En Banc.

SCHNACKENBERG, Circuit Judge.

1. I respectfully disagree with Chief Judge DUFFY in his ruling that retired Judge Major, of this circuit, is not qualified to vote on respondents' petition for rehearing *en banc* or to sit as a part of the court on said *en banc* hearing, if it is allowed. I now state my views.

In a letter dated March 25, 1958, Judge Duffy relies on 28 U.S.C.A. § 46(c), and says that that section

"* * * provides that hearing or rehearing before the Court en banc must be ordered 'by a majority of the circuit judges of the circuit who are in active service.' There is nothing ambiguous about that language. I do not see how it could be more clearly stated. It is only a majority of the circuit judges of the circuit who are in active service who may order a hearing or rehearing en banc.

"The statute further provides: 'A court en banc *shall* consist of all active circuit judges of the circuit.' A retired judge is not an active circuit judge merely because he volunteers for various kinds of judicial

duties. Again, the language is clear and unambiguous."

However, he overlooks other relevant sections of the statute. They are 28 U.S.C.A. §§ 294 and 296, which in their present form were enacted on June 25, 1948, 62 Stat. 901, which is the same day § 46 was enacted in its present form.

Sec. 294(b) provides that

"Any retired circuit * * * judge may be designated and assigned to perform such judicial duties in any circuit as he is willing to undertake. Designation and assignment of such judge for service within his circuit shall be made by the chief judge * * *."

Sec. 296 provides:

"A * * * judge shall discharge, during the period of his designation and assignment, all judicial duties for which he is designated and assigned. He may be required to perform any duty which might be required of a judge of the court * * * to which he is designated and assigned.

"*Such * * * judge shall have all the powers of a judge of the court, * * * to which he is designated and assigned,* except the power to appoint any person to a statutory position or to designate permanently a depository of funds or a newspaper for publication of legal notices.

"A * * * judge who has sat by designation and assignment in another district or circuit may, notwithstanding his absence from such district or circuit or the expiration of the period of his designation and assignment, decide or join in the decision and final disposition of all matters submitted to him during such period and *in the consideration and disposition of applications for rehearing or further proceedings in such matters.* (Emphasis supplied)."

Judge Major, being willing to undertake the judicial duties to which he was assigned, sat on the three-judge panel which decided the case at bar and he concurred in the opinion of the court and the panel's modification of the order entered by the respondents. The designation and assignment to hear this case had not expired and will not expire until this case is finally disposed of in this court, because § 296 makes it clear that he may be required to perform any duty which might be required of a judge of this court, and certainly that would include participating in the final action on a petition for rehearing in this case. That function is included in the language of the second paragraph of § 296 which is to the effect that such a designated and assigned judge "shall have all the powers of a judge of the court * * * to which he is designated and assigned", with certain irrelevant exceptions. Moreover, the third paragraph of § 296 is clear that, even if he were designated to sit in *another* circuit, neither his absence from said circuit or the expiration of the period of his designation and assignment would deprive him of the power to "decide or join in the decision and *final disposition* of all matters submitted to him during such period and *in the consideration and disposition or applications for rehearing or further proceedings in such matters.*" (Emphasis supplied.) *A fortiori,* Judge Major, having been designated and assigned to sit *in his own circuit,* the Seventh, does not have less power than if he had been designated and assigned to sit in *another* circuit.

We are not justified in attributing to congress an intention, by § 46, to prevent a judge, who actively sits on the panel which decides an appeal, from participating in an *en banc* hearing on a petition for rehearing, the object of which is to overturn a major part of the panel's decision. A reading of both §§ 294 and 296, in conjunction with § 46, dispels any such legislative intention. The only reasonable construction which can be given to the entire pertinent legislative language, in its application to this case, is that the designation and assignment of

Judge Major to this case bestowed upon him the duty of acting as a judge therein and in the consideration and disposition of such applications for rehearing as have been or will be filed therein. It would be incredible that congress intended that an experienced and capable retired judge, who voluntarily accepts an assignment to hear a case in his own circuit and in the decision of which he has joined, should be excluded from the consideration of a petition for rehearing thereof, whether or not it is to be heard by the original panel of which he is a member or the court sitting *en banc*. Such a result would be incongruous and contrary to common sense. The construction I urge may involve a "sacrifice of literalness for common sense." This phrase I take from the opinion of Justice Douglas in Textile Mills Corp. v. Com'r, 314 U.S. 326, 334, 62 S.Ct. 272, 277, 86 L.Ed. 249, where he said:

"* * * any sacrifice of literalness for common sense does no violence * * *. Certainly, the result reached makes for more effective judicial administration. Conflicts within a circuit will be avoided. Finality of decision in the circuit courts of appeal will be promoted. Those considerations are especially important in view of the fact that in our federal judicial system these courts are the courts of last resort in the run of ordinary cases. Such considerations are, of course, not for us to weigh in case Congress has devised a system where the judges of a court are prohibited from sitting *en banc*. But where, as here, the case on the statute is not foreclosed, they aid in tipping the scales in favor of the more practicable interpretation."

To me, the legislative intent in enacting § 46 was to prevent the overturning of a panel decision by the loading of the court on an *en banc* hearing by bringing in a number of retired judges who had not been members of the original panel. That intent is based upon an obviously sound purpose, but the section should not be extended beyond that objective.

The views herein expressed find support in United States ex rel. Paetau v. Watkins, 2 Cir., 164 F.2d 457. There Justice Holtzoff of the District of Columbia was designated to sit in the District Court for the Southern District of New York. His first ruling was to amend the warrant of deportation there involved. He thereafter granted respondent's motion for reargument, and, after further hearing changed his holding to agree with respondent and dismissed the writ of habeas corpus. It was held, at 460, that, although his designation had already expired when he granted reargument, he was the proper judge to hear same. The court in a footnote cited Frad v. Kelly, 302 U.S. 312, 316, 58 S.Ct. 188, 191, 82 L.Ed. 282, where the Supreme Court said:

"When an assigned judge has presided at the trial of a cause, he is to have power, though the period of his service has expired, and though he may have returned to his own district, to perform the functions which are incidental and *supplementary to the duties performed by him* while present and acting in the designated district. And where a cause has been submitted to him in the designated district, after his return to his own district he may enter decrees or orders and file opinions necessary to dispose of the case, notwithstanding the termination of his period of service in the foreign district. * * *" (Emphasis supplied.)

I believe that Judge Major is entitled to participate in this case until its final disposition in this court.

2. As to the merits of the petition of respondents for a rehearing *en banc*, I vote to deny said petition. It is expressly based on Moog Industries Inc., v. Federal Trade Commission, (Federal Trade Commission v. C. E. Niehoff & Co.), 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed. 370. However, both the respondents and Judge Parkinson in his separate opinion on the petition for rehearing filed by petitioners in the case at bar have miscom-

prehended the significant effect of the Supreme Court's decision in the Niehoff case. When that case was before this court the Federal Trade Commission took the position that *it had no power* to stay compliance with its order, relying upon a part of § 11 of the amended Clayton Act [1] and contended that it had no discretion as to the enforcement of the law. We called attention to this denial by the Commission of its power to stay its order, 241 F.2d 37, at page 42:

> "The commission takes the position that it has *no power to stay* compliance with its order. \* \* \* *it is our opinion* that this statutory language *vests in the commission power to postpone* the time at which an order is to take effect." (Emphasis supplied.)

The Supreme Court came to the same conclusion, saying, 355 U.S. 411, at page 413, 78 S.Ct. 377, at page 379:

> "\* \* \* It is clearly within the special competence of the Commission to appraise the adverse effect on competition that might result from postponing a particular order prohibiting continued violations of the law. Furthermore, the Commission alone is *empowered* to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically.
>
> "The *question,* then, of whether orders such as those before us should be held in abeyance until the respondents' competitors are proceeded against *is for the Commission to decide.* \* \* \*" (Emphasis supplied.)

It is apparent, therefore, that the Supreme Court agreed with us that the Commission has power to postpone the date for compliance with its order and that the Commission was mistaken in its stated position that it did not have that power. That was the principal question involved in the Niehoff case, as we had held that we would affirm the Commission's order on the merits.

In the case at bar, this court has modified the order entered by respondents, and their petition for rehearing questions our authority to do so. It is not denied that the Commodity Exchange Act in § 9 thereof authorizes this court to affirm, set aside, or modify the order of the Secretary of Agriculture.[2] We *modified* such an order, in disposing of Miller's petition for rehearing, by reducing the penalties imposed on G. H. Miller and Company and Gilbert H. Miller. Respondents' petition for rehearing *en banc* does not in any way explain why, in so doing, we did not thereby "modify the order", as the act expressly authorized us to do. Respondents choose to ignore the act in this critical aspect. We conformed to it.

It would be interesting if the Commission had stated what the words "modify the order" mean. Does the Commission say that they bestow upon this court the mere power to "cross the t's and dot the i's" in the Commission's order?

The respondents have shown no reason for a rehearing *en banc.*

Petition for Review of an order of the Secretary of Agriculture.

FINNEGAN, Circuit Judge.

Despite the caption of the printed statement published by Judge SCHNACKENBERG on April 16, 1958, in the above-captioned case, I have not participated in any opinion whatsoever concerning the respondent's petition for rehearing en banc.

I am awaiting formal action by a majority of this Court on the aforesaid Petition before publicly stating my views, under an express reservation earlier made by me.

On Petition for Rehearing En Banc.

Before DUFFY, Chief Judge, and FINNEGAN, HASTINGS, and PARKINSON, Circuit Judges.

---

1. 15 U.S.C.A. § 21.

2. 7 U.S.C.A. § 9.

PER CURIAM.

A majority of the Circuit Judges of this Circuit in active service having voted in favor of a rehearing en banc in the above entitled cause.

It is ordered, that a rehearing en banc shall be held, and said rehearing shall be limited to the question—Does the Court of Appeals have the power and jurisdiction to change a penalty fixed by respondent Secretary of Agriculture, which penalty is within the statutory limits.

It is further ordered that the briefs heretofore submitted in this cause shall be used upon the petition for rehearing, and that oral argument shall be limited to thirty minutes on a side.

On Rehearing By The Court En Banc

Before DUFFY, Chief Judge, FINNEGAN, SCHNACKENBERG, HASTINGS and PARKINSON, Circuit Judges, on rehearing by the court *en banc*.

PARKINSON, Circuit Judge.

These proceedings originated in this court on a petition to set aside an order of the Secretary of Agriculture revoking the registration of G. H. Miller and Company as a futures commission merchant and Gilbert H. Miller as a floor broker and denying all trading privileges to the other petitioners for periods ranging from sixty days to one year and to cancel all sanctions imposed. There were fifteen petitioners in all.

A panel consisting of Judge Major, a former chief judge now retired but voluntarily rendering meritorious service as a member of this court, and Judge Schnackenberg, an able circuit judge in active service, and the writer of this opinion heard the case and handed down a written opinion denying the petition.

Two of the fifteen petitioners, G. H. Miller and Company and Gilbert H. Miller, filed a petition for rehearing wherein they asserted that Miller was in fact a damaging participant to the alleged manipulative scheme but if not at the most "[a]n objective analysis we submit will place Miller in the category of the lowest participant" and implored this court to reduce the penalties because they were "excessive" submitting an order as to them for entry as follows:

"The registration of G. H. Miller and Company as a futures commission merchant and the registration of Gilbert H. Miller as a floor broker is suspended for a period of six months from the effective date of this order.

With the effective date of this order G. H. Miller and Company and Gilbert H. Miller, directly or indirectly, shall be prohibited from trading speculatively on any contract market for a period of one year. During that period futures contracts may be executed providing they are clearly bona fide hedges against the cash commodity actually possessed by G. H. Miller and Company or Gilbert H. Miller and all contract markets shall refuse to said G. H. Miller and Company and Gilbert H. Miller the right to so trade speculatively on their exchanges for a period of one year."

On Millers' petition for rehearing Judge Schnackenberg, being of the opinion that the "penalties imposed by the Secretary are too harsh", and Judge Major, believing "that the penalties imposed in this matter are too severe", the court ordered the penalty as to Millers reduced. The writer of this opinion dissented. The order was practically verbatim with the submitted form of order hereinabove set out. It reads as follows:

"The registration of G. H. Miller and Company as a futures commission merchant is suspended for six months and the registration of Gilbert H. Miller as a floor broker is suspended for a period of six months, and both of said petitioners are prohibited, directly or indirectly, from trading speculatively on any contract market for a period of one year, and during said one year period futures contracts may be executed providing they are clearly bona fide hedges against the cash

commodity actually possessed by G. H. Miller and Company or Gilbert H. Miller, and all contract markets shall refuse to said G. H. Miller and Company and Gilbert H. Miller the right to so trade speculatively on their exchanges for a period of one year."

In order to resolve the question as to the proper function of the Court of Appeals in proceedings to set aside an order of an administrative agency fixing a penalty within the statutory limits we granted a rehearing before the full court *en banc*.

Section 6(b) of the Commodity Exchange Act, Title 7 U.S.C.A. § 9 provides that the Secretary of Agriculture may suspend, for a period not to exceed six months, or *revoke*, the registration of a futures commission merchant or a floor broker registered under the Act who violates any provision thereof. Accordingly the penalties fixed in the order did not exceed and were within the limits of the statute.

In Great Western Food Distributors v. Brannan, 7 Cir., 1953, 201 F.2d 476, 484, involving an order fixing penalties under the Commodity Exchange Act, we held that "we have nothing to do with the question of severity of the penalty."

In National Lead Company v. Federal Trade Commission, 7 Cir., 1955, 227 F.2d 825, we ordered stricken from a general cease and desist order of the Commission a provision directing each respondent individually to cease and desist from adopting the same or a similar system of pricing for the purpose of "matching" the prices of competitors. The Supreme Court reversed, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438, and restored the stricken provision.

In Moog Industries, Inc., v. Federal Trade Commission (Federal Trade Commission v. C. E. Niehoff & Co.), 1958, 355 U.S. 411, 78 S.Ct. 377, 379, 2 L.Ed.2d 370, the Supreme Court reversed this court which had changed a forthwith cease and desist order so that it took effect at a future time. It held that "it is ordinarily not for courts to modify an-

cillary features of a valid Commission order."

In Arrow Metal Products Corporation v. Federal Trade Commission, 3 Cir., 1957, 249 F.2d 83, 85, the Third Circuit, under similar circumstances as here, correctly defines the function of the Court of Appeals in the following language:

"The petitioners complain that the cease and desist order is too drastic and that some other manner of preventing deception, if any, should be adopted. But the matter of shaping a remedy is for the Commission. Our function is simply, in the words of the Supreme Court, to find whether the Commission has made 'an allowable judgment in its choice of the remedy.' Jacob Siegel Co. v. Federal Trade Commission, 1946, 327 U.S. 608, 612, 66 S.Ct. 758, 760, 90 L.Ed. 888."

It is, therefore, clear to us that if the order of an administrative agency finding a violation of a statutory provision is valid and the penalty fixed for the violation is within the limits of the statute the agency has made *an allowable judgment in its choice of the remedy* and ordinarily the Court of Appeals has no right to change the penalty because the agency might have imposed a different penalty.

The petitioners Miller insist that the penalty here is more severe than any penalty imposed upon any other violator of the Act and cite cases where a lesser penalty was affixed. We are not impressed by such a specious argument.

The very most which can be said for the position of the petitioners Miller is that the penalty must have some "reasonable relation to the unlawful practices found to exist". Federal Trade Commission v. National Lead Co., 1957, 352 U.S. 419, 429, 77 S.Ct. 502, 509, 1 L.Ed.2d 438. This court, in Daniels v. United States, 7 Cir., 1957, 242 F.2d 39, 42, held that "[t]he Administrative decision as to the remedy should be sustained unless the remedy selected has no

reasonable relation to the practice found to exist."

The Judicial Officer concluded from his findings of fact, adequately supported by a preponderance of the evidence, that "[t]he violations of sections 6(b) and 9 of the act found herein are of serious and far-reaching consequences." He also concluded that Miller "was obviously the captain of the 'team' that effectuated what he described to Morris Weinger as the 'deal' in which he was sorry to find Weinger caught."

In the application of the rule that Courts of Appeal must sustain the remedy selected by an administrative agency unless it has no reasonable relation to the practice found to exist we find in this record no lack of reasonableness in the penalty imposed upon Millers. To the contrary the record establishes a direct relation between the penalty and the violation. To paraphrase the language of the Supreme Court in Board of Trade of City of Chicago v. Olsen, 1923, 262 U.S. 1, 39, 43 S.Ct. 470, 67 L.Ed. 839, manipulations of egg futures for speculative profit, though not carried to the extent of a corner or complete monopoly, exert a *vicious influence* and produce abnormal and disturbing temporary fluctuations of prices that are not responsive to actual supply and demand and discourage not only justifiable hedging but disturb the normal flow of actual consignments. Here the petitioners, with Miller as the prime factor, did corner the egg market on the Chicago Mercantile Exchange in December, 1952. The penalties affixed were certainly commensurate with the violation and in their imposition the Secretary of Agriculture did not abuse his discretion.

The order herein entered on February 26, 1958 is vacated and set aside.

1. The Judicial Officer acted for the Secretary of Agriculture pursuant to authority delegated to him. 10 F.R. 13769; 11 F.R. 177A–233; 18 F.R. 3219; 18 F.R. 3648; 19 F.R. 74.

2. Act of September 21, 1922, c. 369, 42 Stat. 998, as amended by the Act of June

The petition to set aside the order of the respondent Secretary of Agriculture issued through the Judicial Officer on September 26, 1956 is denied.

FINNEGAN, Circuit Judge (concurring).

This matter first came to our Court on a petition to review a decision and order, dated September 25, 1956, of the Judicial Officer [1] of the United States Department of Agriculture. At the administrative level this was a disciplinary proceeding under the Commodity Exchange Act.[2] All of the respondents joined in a 62-page petition for reconsideration and reargument submitted to the Judicial Officer, after his Decision and Order was issued for the Department of Agriculture, expressly seeking inter alia reconsideration of "the extent of penalties assessed." Counsel for the Commodity Exchange Authority filed an answer to that petition before the Secretary of Agriculture.

Point V of the brief filed on the merits for the United States and the Secretary of Agriculture, in our Court on October 31, 1957, was: "The Administrative Sanction should be Sustained;" and the point was briefed and authorities in support discussed. Petitioners' original brief filed August 2, 1957 in our Court is silent on the "sanctions." Apparently it was not until three judges of our Court denied the petition for review that G. H. Miller and Company and Gilbert H. Miller decided there was little else left to do but attack the administrative remedy invoked against them.

Section 6(b) of the Commodity Exchange Act [3] provides:

"If the Secretary of Agriculture has reason to believe that any person (other than a contract market)

15, 1936, c. 545, 49 Stat. 1491, as amended, 7 U.S.C.A. § 1 et seq. (1952 ed.) The phrase "to affirm, to set aside, or modify * * *" has been in the Act since 1922. is violating or has violated any of

3. 7 U.S.C.A. § 9.

the provisions of this chapter, or any of the rules and regulations made pursuant to its requirements, or has manipulated or is attempting to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any board of trade, he may serve upon such person a complaint stating his charges in that respect, to which complaint shall be attached or contained therein a notice of hearing, specifying a day and place not less than three days after the service thereof, requiring such person to show cause why an order should not be made directing that all contract markets until further notice of the Secretary of Agriculture refuse all trading privileges to such person, and to show cause why the registration of such person, if registered as futures commission merchant or as floor broker hereunder, should not be suspended or revoked. Said hearing may be held in Washington, District of Columbia, or elsewhere, before the Secretary of Agriculture, or before a referee designated by the Secretary of Agriculture, which referee shall cause all evidence to be reduced to writing and forthwith transmit the same to the Secretary of Agriculture. Upon evidence received, the Secretary of Agriculture may require all contract markets to refuse such person all trading privileges thereon for such period as may be specified in the order, and, if such person is registered as futures commission merchant or as floor broker hereunder, may suspend, for a period not to exceed six months, or revoke, the registration of such person. Notice of such order shall be sent forthwith by registered mail or delivered to the offending person and to the governing boards of said contract markets.

"After the issuance of the order by the Secretary of Agriculture, as aforesaid, the person against whom it is issued may obtain a review of such order or such other equitable relief as to the court may seem just by filing in the United States court of appeals of the circuit in which the petitioner is doing business a written petition praying that the order of the Secretary of Agriculture be set aside. A copy of such petition shall be forthwith served upon the Secretary of Agriculture by delivering such copy to him, and thereupon, the Secretary of Agriculture shall forthwith certify and file in the court a transcript of the record theretofore made, including evidence received. Upon the filing of the transcript the court shall have jurisdiction to affirm, to set aside, or modify the order of the Secretary of Agriculture, and the findings of the Secretary of Agriculture as to the facts, if supported by the weight of evidence, shall in like manner be conclusive."

That the remedies used at the administrative level in this case are within the statutory range of § 6(b) was and still is uncontested. When G. H. Miller and Company and Gilbert H. Miller filed their consolidated petition for "Rehearing and Modification," on January 22, 1958, they asked for a modification of the "excessive penalties assessed against" the petitioners. That petition was the aftermath of the unanimous opinion reported beginning at page ——, ante. An opinion on rehearing was filed February 26, 1958, later implemented, by an order, showing that Judges Major and Schnackenberg agreed the "penalties" imposed were "too severe" and "too harsh." Judge Parkinson who wrote the initial opinion, dissented to the opinion of February 26, 1958. Judges Major and Schnackenberg voted to deny the Millers' petition for rehearing on all other points presented; Judge Parkinson unqualifiedly voted to deny that petition for rehearing.

Understandably, the government petitioned for rehearing before the full Court

sitting *en banc* and the current array of opinions flows from this last hearing.

The significance of this historical background lies in the fact that the initial unanimous opinion, handed down January 8, 1958, was by three Judges who flatly refused to set aside the order of the Secretary of Agriculture and it is that order which underlies the administrative "penalties", so-called, subsequently modified by two members of the original division of this Court, who first heard the petition for review of the Secretary's order.

## I.

Consequently, the question now before us, as I view it, is just how much we can tinker with the Secretary's legal suspension and revocation of trading privileges —concededly within the statutory range —based upon the judicially approved administrative order issued by the Secretary. Indeed, § 6(b) states, *inter alia*: " * * * the findings of the Secretary of Agriculture as to the *facts*, if supported by the weight of evidence shall in like manner be *conclusive*." The three judges of our Court recognized this provision in their first opinion, and refused to disturb that phase of the case on rehearing number one.

Civil remedies and criminal punishments are both prescribed by the Commodity Exchange Act. See 7 U.S.C.A. § 13 and it must be borne in mind that we are not here concerned with a criminal case. Regardless of dramatic catch phrases, *i. e.*, "economic death," we are confronted only with statutory devices committed by the Congress to the Secretary's discretion, for the purpose of policing the market place. To be sure, revocation is a drastic step yet it must be assayed in the environment of the Commodity Exchange Act and the fact these petitioners were exercising a privilege. Another proceeding, Nelson v. Secretary of Agriculture, 7 Cir., 1943, 133 F.2d 453, 456, under the Commodity Exchange Act gave rise to proceedings to set aside an order of the Secretary of Agriculture and Judge Lindley, writing for the division of Judges, said:

"In permitting petitioner to buy and sell grain for future delivery on contract markets, the Government has in effect granted him a privilege. Suspension of such a privilege for failure to comply with the statutory standard is merely withdrawal by the Government of permission to engage in a business affected with the national public interest in which the person has no inherent right to engage, but in which he may participate only upon compliance with conditions imposed by Congress in the exercise of its power over commerce. Inasmuch as Congress has the power to fix conditions upon which petitioner may engage in trading on the market * * * it may, through an administrative agency, withdraw the privilege for violation of these conditions * * * *"

A similar position was taken by the First Circuit in Nichols & Co. v. Secretary of Agriculture, 1 Cir., 1942, 131 F.2d 651, 659: "We believe that suspension of a registrant is not primarily punishment for a past offense but it is necessary power granted to the Secretary of Agriculture to assure a proper adherence to the provisions of the Act."

Chief Judge Duffy has followed the same line of thinking when reviewing a suspension order of a Judicial Officer of the United States Department of Agriculture, issued under the Packers and Stockyards Act, 7 U.S.C.A. § 181 et seq., in Cella v. United States, 7 Cir., 1953, 208 F.2d 783, 789.

Cella was cited and quoted in the brief filed for the government in Daniels v. United States, 7 Cir., 1957, 242 F.2d 39, and used in that opinion by Chief Judge Duffy. Under "contested issues" in the Daniels' brief is this one: "3. The final issue is whether or not the suspension order should be set aside at this time on the grounds that, even under the present record, it is excessively harsh and oppressive." It was to this point then, that Chief Judge Duffy stated: "The Administrative decision as to the remedy should be sustained unless the

remedy selected has no reasonable relation to the practice found to exist * * * In view of respondent's previous violations, the order, including the sanctions, should be approved." 242 F.2d 39, 42.

"Equitable relief" mentioned in § 6(b), is not, in my opinion, Congressional authority for substituting our subjective attitudes concerning the quantum of sanction or duration of suspension of trading privileges for that of the Secretary. A common sense approach, I should think, shows this to be nothing more than a recognition of the common garden variety of temporary injunction. Congress, in my view, simply recognized the usual questions arising in connection with enjoining orders of administrative agencies and made it clear that equitable relief could be invoked against the government. See e. g., Davis, Administrative Law § 213 and § 217, Statutory Limitations on Enjoining Administrative Action. I do not believe "equitable relief" means we are to decide the extent of sanction for that power is expressly conferred on the Secretary (not the Courts) by § 6(b), and as I view it his power is so potent—and necessarily so to achieve the aims of this legislation— that injunctive relief is expressly authorized in order that the basis in fact for administrative action can be probed expeditiously, in appropriate cases, rather than await the run of a calendar of cases for review.

"Modify" is the target word lurking in § 6(b). What has been done in this case was to treat "modify" as a third exclusive remedy on a petition for review of the Secretary's order, i. e., approve his order and modify his order of suspension or revocation of registration. At best, I think the general principles of administrative law would permit modification, by a Court of Appeals, only to the extent of unlawfulness of the Secretary's ruling or order. But so long as the Secretary makes findings of fact and they are based on evidence conforming to the statutory standards and he acts *intra vires* the relevant acts of Congress we cannot, in my opinion, modify sanctions

because we personally think them "too harsh" "too severe." To do otherwise ignores the expertise of the Secretary in the complexities of trading in futures. We can abdicate our judicial function by usurpation just as well as by abandonment to administrative agencies. Obviously all this goes further. Without the word "modify" in § 6(b), Courts of Appeal would have only two alternatives regarding the Secretary's final orders—affirm or set aside. But by using "modify" Congress allows some play in the joints, enabling a reviewing court to send back an order for further administrative action based upon some modification. Even a cursory reading of the first portion of § 6(b) reveals the numerous grounds of administrative action, any one of which could be the basis of a lengthy record and detailed order. Rather than have an order set aside and the proceedings annulled, the word "modify" allows for adjustment between Court, parties and Secretary on some aspects of the order. There is nothing in § 6(b) indicating that the scope of judicial review has been enlarged to the point where periods of suspension, for example, can be either *increased* or *decreased*, or that revocations can be judicially converted into suspensions.

Much lays in the balance here if we merely glance at the word "modify" and let quick reaction turn us away from the broader question demanding our judicial attention. As part of his dissent to the majority in United States v. Monia, 1943, 317 U.S. 424, 431–432, 63 S.Ct. 409, 412, 87 L.Ed. 376, Mr. Justice Frankfurter, caught the theme implicit in statutory interpretation problems:

"The notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification. It is a wooden English doctrine of rather recent vintage [citing], to which lip service has on occasion been given here, but which since the days of Marshall this Court has rejected, especially in practice. [citing] A statute, like other living organisms,

derives significance and sustenance from its environment, from which it cannot be severed without being mutilated. Especially is this true where the statute, like the one before us, is part of a legislative process having a history and a purpose. The meaning of such a statute cannot be gained by confining inquiry within its four corners. * * *"

Though I have quoted from a dissent the concept and grasp of the problem is diminished not one whit because the author was not with the majority. Yet, if it be insisted only majority opinions deserve mention, then what Mr. Justice Reed wrote for the majority of a divided court in United States v. American Trucking Associations, 1940, 310 U.S. 534, 542–544, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, will serve the purpose:

"In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress. There is no invariable rule for the discovery of that intention. To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute, particularly in a law drawn to meet many needs of a major occupation.

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion. Emphasis should be laid, too, upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts. A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, 'excepting as a different purpose is plainly shown.' "

While it may be urged we are not barred legislatively on the bare word "modify" I think the temporary urgency characterized by these petitioners as an "economic death sentence," fails in overriding broader principles controlling court-administrator relations. Virtually all final orders of federal administrative agencies have economic impact on the parties against whom they are directed; obviously such deprivations are the teeth in the statutes. Mr. Justice Douglas, delivering the Court's opinion in Federal Power Commission v. Idaho Power Co.,

1952, 344 U.S. 17, 21, 73 S.Ct. 85, 87, 97 L.Ed. 15, wrote: "The Court, it is true, has power 'to affirm, modify, or set aside' the order of the Commission 'in whole or in part.' * * * But that authority is not power to exercise an essentially administrative function. See Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373–374, 59 S.Ct. 301, 306, 307, 83 L.Ed. 221; Siegel Co. v. Federal Trade Commission, 327 U.S. 608, 66 S. Ct. 758, 90 L.Ed. 888."

Chief Judge Swan, speaking for a division of the Second Circuit, observed in Consumer Sales Corp. v. Federal Trade Commission, 2 Cir., 1952, 198 F.2d 404, 408: "Our power to modify an order such as this, once an illegal trade practice has been found, is severely circumscribed [citing cases in a marginal note], but even if it were not we could find nothing improper about the Commission's efforts to prevent this scheme from reappearing in a slightly altered garb."

"It is a fundamental principle * * * that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.'" American Power & Light Co. v. S. E. C., 1946, 329 U.S. 90, 112, 67 S.Ct. 133, 146, 91 L.Ed. 103. One need only read § 5 of the Commodity Exchange Act, embodying the Congressional declaration of the "dangerous tendency of dealings in commodity futures," to commence understanding the reason why it supplied the Secretary with such drastic remedies:

"Transactions in commodity involving the sale thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest; such transactions are carried on in large volume by the public generally and by persons engaged in the business of buying and selling commodity and products and byproducts thereof in interstate commerce; the prices involved in such transactions are generally quoted and disseminated throughout the United States and in foreign countries as a basis for determining the prices to the producer and the consumer of commodity and the products and byproducts thereof and to facilitate the movements thereof in interstate commerce; such transactions are utilized by shippers, dealers, millers, and others engaged in handling commodity and the products and byproducts thereof in interstate commerce as a means of hedging themselves against possible loss through fluctuations in price; the transactions and prices of commodity on such boards of trade are susceptible to speculation, manipulation, and control, and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control, which are detrimental to the producer or the consumer and the persons handling commodity and products and byproducts thereof in interstate commerce, and such fluctuations in prices are an obstruction to and a burden upon interstate commerce in commodity and the products and byproducts thereof and render regulation imperative for the protection of such commerce and the national public interest therein."

Since the Secretary's order does not contravene any constitutional limitation, is within the constitutional and statutory authority of the Secretary, and is supported by the requisite quantum and quality of evidence, I fail to see how we can set the order aside in part pertaining to the legal sanction or remedy given him to exclude persons from the trading privileges. These remedies are matters left specifically by Congress to the discretion of the Secretary; we fully perform our function on review by a determination that there has been a fair hearing, correct application of the relevant statutory provisions, and nothing contravening constitutional rights.

## II.

In C. E. Niehoff & Co. v. Federal Trade Commission, 7 Cir., 1957, 241 F.2d 37 the Commission's opinion contains this factor: "Stating that an order requiring the respondent to terminate its unlawful discriminations will destroy the Niehoff business when its competitors are not likewise enjoined, appellant [Niehoff] requests that this proceeding be held in abeyance until the Commission can place all industry members under identical restrictions. The pricing practices used by the respondent, however, have been found to be in violation of law. Since their continuance by the respondent is likewise unlawful the Commission's duty under the applicable statute is to require their termination forthwith * * *" 51 F.T.C. 1114 (See also Transcript of Record filed on certiorari, at page 1026).

On review of that Niehoff order and opinion I dissented (241 F.2d 37, 43) because my two colleagues stated "the order against Niehoff is hereby modified by striking the word 'forthwith' therefrom and by adding to said order the following: 'This cease and desist order shall take effect at such time in the future as the United States Court of Appeals for the Seventh Circuit may direct, *sua sponte* or upon motion of the Federal Trade Commission.' As thus modified, the order is affirmed." Judge Major and Judge Schnackenberg invoked § 11 of the Clayton Act, 15 U.S.C. § 21 as their authority for such modification, and, of course, the word "modify" appears in that section of the Clayton Act.

When the Solicitor General, on behalf of the Federal Trade Commission, sought issuance of a writ of certiorari to review our judgment in Niehoff, the question presented in the petition was stated as: "* * * [W]hether the power of judicial review conferred by Section 11 of the Clayton Act authorizes the reviewing court to postpone the operative date of a Commission order adjudicated to be valid, for the declared purpose of rendering the order a nullity until like orders have been entered against respondent's 'competitors.'" (Petition for certiorari, p.

2.) The brief in opposition to the government's petition responded to that issue and the question was thus crystallized for review by the Supreme Court. When certiorari was granted, both sides briefed that particular issue.

On review by the Supreme Court, Niehoff was taken together with Moog Industries, Inc., v. Federal Trade Commission, 1958, 355 U.S. 411, 414, 78 S.Ct. 377, 380, 2 L.Ed.2d 370, where, in a *per curiam*, the Court ordered that the Niehoff judgment be " * * * vacated and the cause remanded to the Court of Appeals [Seventh Circuit] with directions to affirm the order of the Commission in its entirety." Reaching that result the salient portion of the *per curiam* opinion was as follows:

"In view of the scope of administrative discretion that Congress has given the Federal Trade Commission, it is ordinarily not for courts to modify ancillary features of a valid Commission order. This is but recognition of the fact that in the shaping of its remedies within the framework of regulatory legislation, an agency is called upon to exercise its specialized, experienced judgment. Thus, the decision as to whether or not an order against one firm to cease and desist from engaging in illegal price discrimination should go into effect before others are similarly prohibited depends on a variety of factors peculiarly within the expert understanding of the Commission. Only the Commission, for example, is competent to make an initial determination as to whether and to what extent there is a relevant 'industry' within which the particular respondent competes and whether or not the nature of that competition is such as to indicate identical treatment of the entire industry by an enforcement agency. Moreover, although an allegedly illegal practice may appear to be operative throughout an industry, whether such appearances reflect fact and whether all firms in the industry

should be dealt within a single proceeding or should receive individualized treatment are questions that call for discretionary determination by the administrative agency. It is clearly within the special competence of the Commission to appraise the adverse effect on competition that might result from postponing a particular order prohibiting continued violations of the law. Furthermore, the Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically.

"The question, then, of whether orders such as those before us should be held in abeyance until the respondents' competitors are proceeded against is for the Commission to decide. If the question has not been raised before the Commission, as was the situation in No. 77, a reviewing court should not in any event entertain it. If the Commission has decided the question, its discretionary determination should not be overturned in the absence of a patent abuse of discretion."

Certainly that opinion shrivelled the word "modify" in the section of the Clayton Act concerning our reviewing powers and the result understandable when read with an acute awareness of our relationship to the Commission. No doubt the luster of "modify" in pre-Niehoff days would be blinding unless read in the broad context of the administrative law problem.

The word "modify" employed in § 6 (b) should not be construed to reach the statutory remedies given the Secretary unless those remedies, (called "penalties" when viewed from an offender's position) are shown to be wholly without evidentiary support or *ultra vires* the enabling act of the Congress. Of course, if the order suspending a futures commission merchant or floor broker were unsupport-

ed by the "weight of evidence" we would be bound to set it aside. But "modifying" the remedy utilized by the Secretary when his order meets the statutory test, is unsound.

We should, I think, withhold substitution of our judgment of the extent of the Secretary's remedy when he acts within the scope of his statutory standards and administrative discretion. Congress entrusted the Secretary with these remedies to cope with market problems arising within his jurisdiction. Clearly the question of remedy, whether suspension or revocation, is peculiar to this case and these facts and consequently we ought not to interfere with particularized application of § 6(b) when there is absent any constitutional impingements and the Secretary's compliance with relevant statutes is unchallenged.

Our personal powers of discrimination might well discredit the degree of remedy invoked by the Secretary because it does not square with our individual judgments. But this can arise from circular thinking enclosing the record and our personal predilections rather than combining all of that with the Secretary's experience, knowledge and goal. After all this is a review, not a petition for enforcement of an administrative order. Here I do not wish to be misunderstood. I speak from a point of view confronting what I believe to be the judicial function in this situation which is not too well delineated by case precedent. On the record now before us the question is not whether the remedy is too harsh. Congress invested the Secretary with primary authority for selecting among statutory remedies the ones useful to achieve the purposes for which such power was granted. Whether facts found by the Secretary amount to a violation is a question of law for this Court. The initial judicial review answered that question favorably for the administrator going further when no other error of law has been urged invades the province of discretion granted the Secretary. To countenance judicial adjustment of sanctions imposed by the Secretary in this

case makes a stalking horse out of the statutory word "modify."

SCHNACKENBERG, Circuit Judge (dissenting).

By this court's order the rehearing *en banc* was limited to this question: Does the Court of Appeals have the power and jurisdiction to change a penalty fixed by respondent Secretary of Agriculture, which penalty is within the statutory limits? In effect, Judge Parkinson's opinion answers this question in the negative. Inasmuch as I find myself in dissent, I deem it essential to state my reasons. The prior proceedings herein are partly set forth in Judge Parkinson's opinion, *supra*. His statement in that regard needs the following supplementation and clarification.

1. After retired Circuit Judge Major and I modified the original panel opinion written by Judge Parkinson, over his objection that this court "has no power or right to reduce a penalty imposed by this respondent which is within the statute", the order for the *en banc* hearing eliminated Judge Major from further consideration of the case (to which he had been regularly assigned). Thereby, not only his vote, but the benefit of his mature judgment in conference with the other members of the court, were lost. The only reason given for excluding Judge Major at that point was reliance upon 28 U.S.C.A. § 46(c), which reads:

"(c) Cases and controversies shall be heard and determined by a court or division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in active service. A court in banc shall consist of all active circuit judges of the circuit."

This reasoning, however, overlooks other relevant sections of the statute. They are 28 U.S.C.A. § 294(b) and § 296, which in their present form were enacted on June 25, 1948, 62 Stat. 901, which is the same day § 46 was enacted in its present form.

Sec. 294(b) provides:

"Any retired circuit * * * judge may be designated and assigned to perform such judicial duties in any circuit as he is willing to undertake. Designation and assignment of such judge for service within his circuit shall be made by the chief judge * * *."

Sec. 296 provides:

"A * * * * judge shall discharge, during the period of his designation and assignment, all judicial duties for which he is designated and assigned. He may be required to perform any duty which might be required of a judge of the court * * * to which he is designated and assigned.

"*Such * * * judge shall have all the powers of a judge of the court, * * * to which he is designated and assigned,* except the power to appoint any person to a statutory position or to designate permanently a depository of funds or a newspaper for publication of legal notices.

"A * * * judge who has sat by designation and assignment in another district or circuit may, notwithstanding his absence from such district or circuit or the expiration of the period of his designation and assignment, decide or join in the decision and final disposition of all matters submitted to him during such period and *in the consideration and disposition of applications for rehearing or further proceedings in such matters.*" (Emphasis supplied.)

Judge Major, being willing to undertake the judicial duties to which he was assigned, sat on the three-judge panel which decided the case at bar and he concurred in the opinion of the court and the panel's modification of the order entered by the respondents. The designation and assignment to hear this case had not expired when a rehearing *en banc* was ordered and will not expire until this case is finally disposed of in this

court, because § 296 makes it clear that he may be required to perform any duty which might be required of a judge of this court, and certainly that would include participating in the final action on a petition for rehearing in this case. That function is included in the language of the second paragraph of § 296, which is to the effect that such a designated and assigned judge "shall have all the powers of a judge of the court, * * * to which he is designated and assigned", with certain irrelevant exceptions. Moreover, the third paragraph of § 296 is clear that, even if he were designated to sit in *another* circuit, neither his absence from said circuit or the expiration of the period of his designation and assignment would deprive him of the power to "decide or join in the decision and *final disposition* of all matters submitted to him during such period and *in the consideration and disposition of applications for rehearing or further proceedings in such matters.*" (Emphasis supplied.) *A fortiori*, Judge Major, having been designated and assigned to sit *in his own circuit*, the Seventh, does not have less power than if he had been designated and assigned to sit in *another* circuit.

We are not justified in attributing to congress an intention, by § 46, to prevent a judge, who actively sits on the panel which decides an appeal, from participating in an *en banc* hearing on a petition for rehearing, the object of which is to overturn a major part of the panel's decision. A reading of both § 294(b) and § 296, in conjunction with § 46, dispels any such legislative intention. The only reasonable construction which can be given to the entire pertinent legislative language, in its application to this case, is that the designation and assignment of Judge Major to this case bestowed upon him the duty of acting as a judge therein and in the consideration and disposition of such applications for rehearing as have been or will be filed therein. It would be incredible that congress intended that an experienced and capable retired judge, who voluntarily accepts an assignment to hear a case in his own circuit and in the decision of which he has joined, should be excluded from the consideration of a petition for rehearing thereof, whether or not it is to be heard by the original panel of which he is a member or the court sitting *en banc*. Such a result would be incongruous and contrary to common sense. Even if it could be urged that this construction involves a "sacrifice of literalness for common sense," I call attention to the apt language of Justice Douglas in Textile Mills Securities Corp. v. Com'r, 314 U.S. 326, 334, 62 S.Ct. 272, 277, 86 L.Ed. 249, where he said:

"* * * any sacrifice of literalness for common sense does no violence * * *. Certainly, the result reached makes for more effective judicial administration. Conflicts within a circuit will be avoided. Finality of decision in the circuit courts of appeal will be promoted. Those considerations are especially important in view of the fact that in our federal judicial system these courts are the courts of last resort in the run of ordinary cases. Such considerations are, of course, not for us to weigh in case Congress has devised a system where the judges of a court are prohibited from sitting *en banc*. But where, as here, the case on the statute is not foreclosed, they aid in tipping the scales in favor of the more practical interpretation."

To me, the legislative intent in enacting § 46 was to prevent the overturning of a panel decision by the loading of the court on an *en banc* hearing by bringing in a number of retired judges who had not been members of the original panel. That intent is based upon an obviously sound purpose, but the section should not be extended beyond that objective.

The views herein expressed find support in United States ex rel. Paetau v. Watkins, 2 Cir., 164 F.2d 457. There Justice Holtzoff of the District of Columbia was designated to sit in the District Court for the Southern District of New York. His first ruling was to amend

the warrant of deportation there involved. He thereafter granted respondent's motion for reargument, and, after further hearing, changed his holding to agree with respondent and dismissed the writ of habeas corpus. It was held, at page 460, that, although his designation had already expired when he granted reargument, he was the proper judge to hear same. The court in a footnote cited Frad v. Kelly, 302 U.S. 312, 316, 58 S.Ct. 188, 191, 82 L.Ed. 282, where the Supreme Court said:

> "When an assigned judge has presided at the trial of a cause, he is to have power, though the period of his service has expired, and though he may have returned to his own district, to perform the functions which are incidental and *supplementary to the duties performed by him* while present and acting in the designated district. And where a cause has been submitted to him in the designated district, after his return to his own district he may enter decrees or orders and file opinions necessary to dispose of the case, notwithstanding the termination of his period of service in the foreign district. * * *" (Emphasis supplied.)

I believe that Judge Major is entitled to participate in this case until its final disposition in this court.

2. Judge Parkinson's opinion reveals no disagreement among members of the court as to the harshness of the penalty imposed by the administrative agency,— but disagreement only as to the court's *power* to restrain the agency when it seeks to inflict an unreasonable and harsh penalty. Here Judge Major and I have relied upon the heretofore undisputed power of courts to protect citizens from such a penalty. This court has exercised its jurisdiction to review the sanctions imposed by the Secretary of Agriculture, under the Packers and Stockyards Act, in Daniels v. United States, 7 Cir., 242 F.2d 39. Chief Judge Duffy, who wrote the court's opinion in that case, did not in any way indicate that this court had

no power to pass upon a contention that the sanctions imposed by the Secretary of Agriculture were excessive. Instead he proceeded, at page 42, to review the facts in the record bearing upon that contention and came to the conclusion that the record supported the sanctions imposed.

Traditionally, courts who find their historical roots in Anglo-Saxon jurisprudence have always been alert to strike down harsh or excessive penalties.

Legislatively, congress has expressly bestowed upon this court power to *"modify"* orders of the administrative agency here involved. 7 U.S.C.A. § 9 provides:

> "After the issuance of the order by the Secretary of Agriculture, as aforesaid, the person against whom it is issued may obtain a review of such order or *such other equitable relief as to the court may seem just* by filing in the United States court of appeals of the circuit in which the petitioner is doing business a written petition praying that the order of the Secretary of Agriculture be set aside. * * * the court shall have jurisdiction to affirm, to set aside, or *modify* the order of the Secretary of Agriculture, * *." (Italics supplied.)

Both Judge Parkinson and the respondents have mistakenly relied upon Federal Trade Commission v. C. E. Niehoff & Co., 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370, which held, in a Federal Trade Commission case, that we were correct in our holding, 7 Cir., 241 F.2d 37, at page 42, where we said:

> "The commission takes the position that it has *no power to stay* compliance with its order. It relies upon a part of section 11 of the amended Clayton Act, contending that it has no discretion as to the enforcement of the law. It fails to cite that part of section 11 which provides that the commission 'shall issue * * * an order requiring such person to cease and desist from such violations * * * *within the*

*time fixed by said order.'* \* \* \*
*It is our opinion* that this statutory language *vests in the commission power to postpone* the time at which an order is to take effect." (Italics supplied for emphasis.)

It is true that, in order to induce the Federal Trade Commission to seek a review in the United States Supreme Court in the Niehoff case, we modified the Commission's order *sua sponte,* in view of the Commission's assertion that it had *no power* to stay compliance with its order. The Commission thereupon took the case to the Supreme Court which *inter alia* sustained our holding that the Commission did have such power. It is apparent, therefore, that the Supreme Court agreed with us that the Commission had power to postpone the date for compliance with its order and that the Commission was mistaken in its stated position that it did not have that power. That was the principal question involved in the Niehoff case, as we had held that we would affirm the Commission's order on the merits.

Judge Parkinson's opinion in the *en banc* proceeding avoids the language of 7 U.S.C.A. § 9, *supra,* as to our power to grant "such other equitable relief as to the court may seem just" and our power to "modify the order of the Secretary of Agriculture", by simply not mentioning it. Why this crucial language in the statute is swept under the rug is not explained. Judge Parkinson does not in any way explain why the panel's changing of the order of the Secretary of Agriculture, by reducing the penalties imposed on G. H. Miller and Company and Gilbert H. Miller, did not amount to a modification of the order, as is expressly authorized by the Act. He has ignored the Act in that critical aspect. It would be interesting if Judge Parkinson or counsel for the Secretary of Agriculture had stated what the words "modify the order" mean. Do the words bestow upon this court the mere power to "cross

the t's and dot the i's" in an agency's order? Judge Parkinson instead emphasizes the statutory grant of *power to the agency to "revoke"* a license.[1] Our cleavage is over the question of *our* power—not the power *of the agency.* Here we have express authority to affirm, set aside or *modify* the administrative order, and to grant equitable relief as to us may seem just. Those are the words of congress. While congress has adopted a policy which recognizes the usefulness of a system of administrative agencies, it has seen the need for judicial control of such agencies, which usually exercise the multiple functions of instigating proceedings, gathering evidence, as well as prosecuting and acting as judges of those proceedings. Moreover, most Americans realize the need for judicial control because they see in the history of commissions and other administrative agencies no proof that they are infallible. The majority opinion would sustain in *all* cases the most severe penalty which the agency may be authorized by congress to impose in the most aggravated case, taking the position that we are powerless to restrain such abuse of authority. The mere statement of such a doctrine exhibits its utter speciousness.

While this is an obscure case, it is one which will shock all observers of the American scene, when its full import is realized. It marks a court's retreat from a long-established line of defense. The publication of the court's opinion will emerge as an outright abdication of a judicial protection upon which our citizens have hitherto justifiably and proudly relied.

In a nutshell we have here a situation in which an agency has imposed upon two citizens what is virtually economic death. To review the harshness of this action they came to the court designated by congress to review the agency's decisions. They are met by a refusal by that court to perform its function in this regard. Asserting its impotence, it ab-

---

[1]. 7 U.S.C.A. § 9. It will be noted that this section does not require a revocation. Other alternatives are provided.

dicates its functions and leaves the citizens remediless.

The action of the original panel in modifying the order of the Secretary of Agriculture, as to the penalty imposed, was correct.